549 A.2d 81

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Scott Wayne BLYSTONE, Appellant.**

Supreme Court of Pennsylvania.

Argued March 9, 1987.

Reargued March 7, 1988.

Decided Oct. 17, 1988.

---

**2.** 42 Pa.C.S.A. § 9711(h)(3)(iii).

452

454

Samuel J. Davis, John M. Purcell, Davis & Davis, Uniontown (court-appointed), for appellant.

Alphonse LePore, Jr., Dist. Atty., James J. Nesser, Ewing D. Newcomer, Uniontown, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION

McDERMOTT, Justice.

A jury found the appellant, Scott Wayne Blystone, guilty of murder of the first degree,[1] robbery,[2] criminal conspiracy to commit homicide,[3] and criminal conspiracy to commit

---

1. 18 Pa.C.S. §§ 2501; 2502(a).
2. 18 Pa.C.S. § 3701.
3. 18 Pa.C.S. § 903.

robbery.[4] After further deliberation that same jury set the penalty for the murder conviction at death.[5] The appellant was also sentenced to ten to twenty years imprisonment for the robbery conviction.[6] He directly appeals these judgments of sentence.[7]

 It is the practice of this Court in cases in which the death penalty has been imposed to review the sufficiency of the evidence supporting an appellant's conviction. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26–27 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). We do so with an eye to see whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the jury to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976). In the instant case the evidence presented to the jury, together with all reasonable inferences in favor of the Commonwealth, discloses the following.

On the night of Friday, September 9, 1983, Scott Blystone, his girlfriend and another couple were riding around Fayette County in Blystone's automobile. Blystone, who was driving, worried about the fact that his automobile was low on gasoline and he had no money with which to purchase more. At approximately midnight, Blystone observed Dalton Charles Smithburger, Jr., hitchhiking. Blystone announced to his companions: "I am going to pick this guy up and rob him, okay, . . .?" His friends endorsed the idea, or at best did nothing to oppose it, so Blystone pulled over to pick up his victim. Unfortunately, Smithburger, who was not acquainted with anyone in the car, accepted the ride.

Once underway Blystone asked Smithburger if he had any money to contribute for the purpose of purchasing gasoline. Smithburger replied that he had only a few

4. *Id.*
5. 42 Pa.C.S. § 9711.
6. 18 Pa.C.S. § 1103(1).
7. *See* 42 Pa.C.S. §§ 722(4); 9711(h)(1). Pa.R.A.P. 702(b).

dollars and reached into his pocket. Dissatisfied with that response, Blystone drew a revolver which he held to Smithburger's head. In no uncertain terms Blystone ordered Smithburger to shut his eyes and place his hands on the dashboard. Smithburger understandably offered no resistance. Though in the course of a taped interview he would later admit that "I almost splattered him right there in the car," Blystone assured Smithburger that he would lose only his money, not his life.

Blystone pulled the car off the road at a lonely spot and walked Smithburger at gunpoint a short distance into an adjacent field. Blystone searched Smithburger, finding thirteen dollars. He ordered Smithburger to lie face down on the ground and wait. Smithburger complied. Blystone briefly returned to his companions in the car to inform them that he was going to kill Smithburger. The best that can be said for Blystone's friends is that perhaps they were startled into ambivalence by the enormity of the statement.

In any event Blystone decided to kill Smithburger. He returned to the field where he found his victim as he had left him. Blystone knelt on Smithburger's back and asked him whether he could identify the vehicle which had picked him up. Smithburger correctly replied, "all I know is it was green and the back end was wrecked." Blystone then said, "goodbye" and emptied his revolver into the back of Smithburger's head.

Such "goodbyes" are rarely the end. Such deaths take on a life of their own and rattle through the lives of the those who know, until chance or nature loosens tongues. Appellant Blystone heard more than the voice of his passengers; he heard his own voice bragging in vivid and grisly detail of the killing of that unlucky lad. (See the Appendix attached to this opinion.)

Blystone eluded detection as Smithburger's murderer for over three months. However, his associates eventually exposed him. The testimonial evidence they contributed to the Commonwealth's case, along with physical evidence, would have been sufficient to support Blystone's convic-

tions. Additionally, an audio tape of Blystone describing the murder to an informant was presented to the jury (See Appendix). The combined effect of all this material was to present the jury with evidence of the appellant's guilt which was more than sufficient; it was overwhelming.

 Nevertheless, the appellant attacks the sufficiency of the evidence supporting his robbery conviction and, consequently, the imposition of the death penalty.[8] Specifically, the appellant argues, the Commonwealth did not present sufficient evidence to satisfy the *corpus delicti* requirement for the crime of robbery. To establish the *corpus delicti* of robbery, the Commonwealth must prove a theft by criminal means. *Commonwealth v. Tallon*, 478 Pa. 468, 475, 387 A.2d 77, 81 (1978). In other words, the Commonwealth bears a burden to show that the crime actually occurred.

The Commonwealth presented ample evidence, apart from the appellant's own admissions, that Scott Blystone did in fact rob Dalton Smithburger. Both of the young women in the car that night testified that the armed appellant took thirteen dollars from Smithburger. One of the women testified on this point as follows:

Q. [Prosecutor]: Did Scott say whether or not he took the money?

A. He didn't have no money on him before and that is how he got the gas is with that money.

Q. With that thirteen dollars?

A. With that thirteen dollars ...

Thus the appellant's argument on this point is meritless.[9]

Apart from the sufficiency of the evidence supporting this robbery conviction, the appellant asserts a second theo-

8. The only aggravating factor the jury found to exist for purposes of setting the penalty at death was the fact that Blystone killed Smithburger during the course of a felony, *i.e.,* robbery. 42 Pa.C.S. § 9711(d)(6). Thus, the death penalty cannot stand should the robbery conviction fall.

9. The appellant also asserts that trial counsel was ineffective for failing to argue and preserve any *corpus delicti* issue relating to the robbery conviction. Since we have addressed the substance of the

ry which would render this felony harmless for the purpose of setting the penalty for his murder conviction. Blystone argues that the robbery of Smithburger was completed prior to the murder and since the killing was not committed "while in the perpetration of a felony," 42 Pa.C.S. § 9711(d)(6), he cannot be sentenced to death.[10] This proposition is absurd.

The crime of robbery is clearly defined:

(1) A person is guilty of robbery if, in the course of committing a theft, he:

(i) inflicts serious bodily injury upon another;

(ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury;

(iii) commits or threatens immediately to commit any felony of the first or second degree;

(iv) inflicts bodily injury upon another or threatens another with or intentionally puts him in fear of immediate bodily injury; or

(v) physically takes or removes property from the person of another by force however slight.

(2) An act shall be deemed "in the course of committing a theft" if it occurs in an attempt to commit theft or in flight after the attempt or commission.

18 Pa.C.S. § 3701(a).

■ The evidence concerning the robbery and killing was uncontroverted. The appellant searched his victim at gunpoint, taking thirteen dollars; forced him to lie down; and instructed him not to move unless he wished to die. Blystone then traversed the short distance to his automobile, remaining there only long enough to announce his murderous intent and gain the endorsement of his companions. Meanwhile, Smithburger remained motionless on the ground out of fear that Blystone would fulfill his deadly promise should he resist or attempt to flee. Indeed, Blystone described in detail how he instilled doubt in Smithbur-

corpus delicti issue in our review of the sufficiency of the evidence, we will not consider the ineffectiveness claim.

**10.** *See* note 8, *supra.*

ger's mind as to whether his robber was merely a few feet away or fled the scene: "He never moved. He thought I was there. I stepped around him, right, and I walked a little bit in a circle and I stopped. I didn't make no noise, and I said 'don't think I am gone, mother-f_____r,' and then I f_____g tiptoed off, you know." Upon his return from the automobile Blystone killed Smithburger; only then did he flee the scene. Thus, this robbery was not complete when Blystone took Smithburger's money, nor when Blystone went to his car, but when he successfully fled the scene after murdering his victim.

Finding the evidence sufficient to support the convictions, we turn our attention to what the appellant characterizes as errors of the trial court. The appellant contends that these rulings by the court tainted his trial in such a way that he must be granted another. We address these rulings of the trial judge in chronological order.

A particularly incriminating piece of evidence in the Commonwealth's arsenal consisted of a tape recording of a conversation between the appellant and a police informant (See Appendix). On the tape Blystone is heard to recall the Smithburger robbery and homicide in lurid detail. Of course, the appellant attempted to keep this evidence from the jury by means of a pre-trial suppression motion.

After a suppression hearing the trial judge denied the appellant's motion and portions of the tape were played before the jury during trial. The court found the tape admissible because the surveillance was conducted in compliance with procedures permitted under the Wiretapping and Electronic Surveillance Control Act[11] in that the informant consented to wear a "wire".[12] The Act provides in pertinent part:

§ 5704. Exceptions to prohibition on interception and disclosure of communications.

---

11. Act of October 4, 1978, P.L. 831, No. 164, § 2, 18 Pa.C.S. § 5701 *et seq.*

12. In this instance the informant carried a tape recorder as well as a body transmitter which enabled the police to remotely monitor and record the conversation.

It shall not be unlawful under this chapter for:

. . . . .

(2) Any investigative or law enforcement officer or any person acting at the direction or request of an investigative or law enforcement officer to intercept a wire or oral communication involving suspected criminal activities where:

. . . . .

(ii) one of the parties to the communication has given prior consent to such interception. However, no interception under this paragraph shall be made unless the Attorney General or a deputy attorney general designated in writing by the Attorney General, or the district attorney, or an assistant district attorney designated in writing by the district attorney of the county wherein the interception is to be made, has reviewed the facts and is satisfied that the consent is voluntary and has given prior approval for the interception; however such interception shall be subject to the recording and record keeping requirements of section 5714(a) (relating to recording of intercepted communications) and that the Attorney General, deputy attorney general, district attorney or assistant district attorney authorizing the interception shall be the custodian of recorded evidence obtained therefrom.

18 Pa.C.S. § 5704(2)(ii).

The appellant argues that warrant'ess consensual monitoring, as authorized by the Act, violated his rights as guaranteed by Article I, § 8 of the Constitution of Pennsylvania, which provides:

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

This argument has been recently accepted by the Superior Court. *Commonwealth v. Schaeffer*, 370 Pa.Super. 179, 536 A.2d 354 (1987).[13] We, however, have not heretofore considered the matter.

■ A look at the history of wiretapping in this Commonwealth reveals that the General Assembly has been cognizant of intrusions into the personal liberties of our citizens. For instance, our original statute dealing with the issue of wiretaps forbade any wiretapping unless all parties consented.[14] However, the current electronic surveillance statute strikes a balance between citizens' legitimate expectation of privacy and the needs of law enforcement officials to combat crime. In this regard the General Assembly has provided safeguards to protect the liberties of the citizens of the Commonwealth. For instance, the statute requires the Attorney General, deputy attorney general designated in writing by the Attorney General, district attorney, or an assistant district attorney designated in writing by the district attorney, to make a review of the facts of each case. Consent for the interception must be given by one of the parties. The Attorney General, deputy attorney general, district attorney, or assistant district attorney must be satisfied that the consent is voluntary. Only then will approval for the interception be given. In addition, the intercepted communications are subject to strict record keeping requirements.[15]

**13.** It should be noted that prior to the Superior Court's opinion in *Commonwealth v. Schaeffer*, 370 Pa.Super. 179, 536 A.2d 354 (1987), no court in this Commonwealth had accepted the position espoused by appellant. *See Commonwealth v. Harvey*, 348 Pa.Super. 544, 502 A.2d 679 (1985); *Commonwealth v. Hassine*, 340 Pa.Super. 318, 490 A.2d 438 (1985). *See also United States v. Geller*, 560 F.Supp. 1309 (E.D.Pa.1983), *aff'd sub nom. United States v. DeMaise*, 745 F.2d 49 (3d Cir.1984), *cert. denied*, 469 U.S. 1109, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985). Therefore, the trial judge's rejection of appellant's position on this issue was consistent with precedent.

**14.** Act of July 16, 1957, P.L. 956, No. 411 § 1, 18 P.S. § 3742. *See Commonwealth v. Papszycki*, 442 Pa. 234, 275 A.2d 28 (1971).

**15.** *See* 18 Pa.C.S. § 5714(a).

Appellant contends, however, that despite these safeguards the statute fails to pass constitutional muster. We disagree.

A statute commands the presumption of constitutionality when it is lawfully enacted, unless it clearly, palpably, and plainly violates the constitution. *Hayes v. Erie Ins. Exchange,* 493 Pa. 150, 425 A.2d 419 (1981); *Tosto v. Pennsylvania Nursing Home Loan Agency,* 460 Pa. 1, 331 A.2d 198 (1975). Any doubts are to be resolved in favor of sustaining the legislation. *Hayes, supra,* 493 Pa. at 155, 425 A.2d at 421.

In the area of electronic surveillance it has already been established that one-party consensual interceptions do not violate the Fourth Amendment. *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) *reh. denied,* 402 U.S. 990, 91 S.Ct. 1643, 29 L.Ed.2d 156 (1971) (plurality opinion). Howeyer, since state courts are free to provide broader protections based on state constitutional grounds than those provided by the federal constitution, *Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967) *reh. denied,* 386 U.S. 988, 87 S.Ct. 1283, 18 L.Ed.2d 243 (1967); *Commonwealth v. Sell,* 504 Pa. 46, 470 A.2d 457 (1983), the federal precedents are not controlling, and consideration of our state constitution is required.

It has been held that the protection provided by Article I, § 8 of the Pennsylvania Constitution extend[s] to those zones where one has a reasonable expection of privacy, *Commonwealth v. DeJohn,* 486 Pa. 32, 403 A.2d 1283 (1979) *cert. denied,* 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980); and that Article I, § 8 creates an implicit right to privacy in this Commonwealth. *Commonwealth v. Platou,* 455 Pa. 258, 312 A.2d 29 (1973) *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). To determine whether one's activities fall within the right of privacy, we must examine: first, whether appellant has exhibited an

expectation of privacy; and second, whether that expectation is one that society is prepared to recognize as reasonable. *Commonwealth v. Sell, supra; Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Concurring Opinion, Harlan, J.); *Commonwealth v. Tann,* 500 Pa. 593, 459 A.2d 322 (1983).

■ The United States Supreme Court has held that a person cannot have a justifiable and constitutionally protected expectation that a person with whom he is conversing will not then or later reveal that conversation to the police. *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963) *reh. denied,* 375 U.S. 870, 84 S.Ct. 26, 11 L.Ed.2d 99 (1963); *United States v. White, supra; Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) *reh. denied,* 386 U.S. 940, 87 S.Ct. 970, 17 L.Ed.2d 880 (1967). Furthermore, as noted above, the Court has held that one party interceptions do not violate the Fourth Amendment. *United States v. Caceres, supra.*

Basically, the Supreme Court has recognized the simple fact that a thing remains secret until it is told to other ears, after which one cannot command its keeping. What was private is now on other lips and can no longer belong to the teller. What one choses to do with another's secrets may differ from the expectation of the teller, but it is no longer his secret. How, when, and to whom the confidant discloses the confidence is his choosing. He may whisper it, write it, or in modern times immediately broadcast it as he hears it.

■ As applied to this case the above cited cases are particularly significant for two reasons: one, the Pennsylvania wiretapping statute is based on its federal counterpart, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20,[16] the latter of which was cited with approval by the United States Supreme Court in *Caceres, id.* 440 U.S. at 742, 99 S.Ct. at

16. Public Law 90–351, Title III, § 802, June 19, 1968, Stats. 213.

1466; [17] and two, it is the federal body of law from which we derive our test for determining what actions fall under the rubric of a privacy right, *Katz, supra,* (Concurring Opinion, Harlan, J.).

Although, unless dictated by Supremacy Clause considerations, we are not bound to follow the federal interpretation of the federal act or the federal constitution in the interpretation of our state statute and/or constitution, we are in this case, persuaded by the rationale behind those decisions. As Mr. Justice White stated in the lead opinion in *United States v. White,*

> Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights. *Hoffa v. United States,* 385 U.S. at 300–303 [87 S.Ct. at 412–14]. For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person, *Lopez v. United States, supra;* (2) or carries radio equipment which simultaneously transmits the conversations either to recording equipment located elsewhere or to other agents monitoring the transmitting frequency. *On Lee v. United States, supra* [343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952)]. If the conduct and revelations made of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks.

17. *See also, Gelbard v. United States,* 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972); *United States v. Cianfrani,* 573 F.2d 835 (3d Cir.1978).

401 U.S. at 751, 91 S.Ct. at 1126.[18] (These statements were cited with approval in *Caceres, supra,* 440 U.S. at 742–43, 99 S.Ct. at 1466–67).

 Therefore, since we find no constitutional defect in the statute, and since the Commonwealth in this case operated in compliance with the statute, the appellant's vivid recounting of the brutal murder of Dalton Smithburger was properly admitted.

Appellant next argues that the trial court improperly sustained a Commonwealth challenge for cause of a prospective juror because that juror's opposition to the death penalty did not illustrate an inability to perform as a juror. The relevant *voir dire* testimony follows.

Q. *[Prosecutor]: If, after hearing all of the evidence in this case and the law as his Honor, Judge Adams, will give you, and as a member of this jury you believed that the death penalty is warranted, would you impose such a penalty?*

A. *Does that mean "capital punishment"? I don't believe in that.*

Q. *That is the death penalty. Do you have a moral or religious belief against capital punishment?*

A. *I am a Baptist and I don't believe in capital punishment.*

Q. *It is against your religious beliefs to support capital punishment?*

---

18. Mr. Justice White further stated:

 Nor should we be too ready to erect constitutional barriers to relevant and probative evidence which is also accurate and reliable. An electronic recording will many times produce a more reliable rendition of what a defendant has said than will the unaided memory of a police agent. It may also be that with the recording in existence it is less likely that the informant will change his mind, less chance that threat of injury will suppress unfavorable evidence and less chance that cross-examination will confound the testimony. Considerations like these obviously do not favor the defendant, but we are not prepared to hold that a defendant who has no constitutional right to exclude the informer's unaided testimony nevertheless has a Fourth Amendment privilege against a more accurate version of the events in question.

 *United States v. White,* 401 U.S. 745, 753, 91 S.Ct. 1122, 1126, 28 L.Ed.2d 453 (1971).

A. *Yes, it is.*

[Prosecutor]: Challenge for cause.

[Defense Counsel]: I would object to the challenge based on her answer.

Judge Adams: The Supreme Court has recently ruled that this is a legitimate reason to challenge for cause. We would overrule the objection. Mrs. [prospective juror], we would advise you that you are not going to be asked to serve on this jury because of your feeling. I would ask you please not to discuss with any other juror the questions that were asked you or your reasons for being excused. Thank you. You may step down.

(Emphasis added).

■ A determination of whether to disqualify a prospective juror is made by the trial judge based on both that juror's answers as well as demeanor, and will not be reversed absent a palpable abuse of discretion. *Commonwealth v. DeHart*, 512 Pa. 235, 248, 516 A.2d 656, 663 (1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987).

■ The trial court clearly considered these criteria in granting the Commonwealth's challenge.

This court, as to Juror Number 102, had no difficulty in reaching the decision that her attitude and manner, as well as her words, indicated she had personal and religious beliefs which would prevent and substantially impair her performance and duty as a juror in accordance with the court's instructions and her oath. It is conceded that the court's dismissal for cause was abrupt, and that more extensive questioning would have placed an Appellate Court in a better position to resolve the issue so far as the printed record is concerned, but this court is clearly of the opinion, based on the printed record as shown, and the attitude and manner of the juror as this court found it to be, that she did not meet the standards set forth and was properly excluded from the jury for cause.

Slip op. at 60–61. Though the trial court is apologetic for the state of the printed record, that concern is unnecessary. For the purpose of ruling on the Commonwealth's motion, the dispositive questions were posed and answered as indicated by our emphasis. This exchange shows this prospective juror could not carry out her duty to follow the law as the trial judge would instruct and, therefore, was properly excluded. *Commonwealth v. Sneed*, 514 Pa. 597, 526 A.2d 749 (1987); *Commonwealth v. Peterkin*, 511 Pa. 299, 513 A.2d 373 (1986), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). *See Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

The appellant's final assertion of error on the part of the trial court concerns the testimony of the victim's father, Dalton Charles Smithburger, Sr. Appellant argues that the trial court erroneously permitted the Commonwealth to introduce testimony of the victim's character, intelligence and propensity to follow orders. The appellant contends that the impact of this testimony was to create sympathy for the victim which was irrelevant for purposes of determining the guilt or innocence of the defendant.

Initially, we note that the appellant has waived this issue by failing to object to this specific testimony. The sidebar conference during which the appellant's trial counsel voiced his objection follows.

[Defense Counsel]: We would stipulate to the testimony of Mr. Smithburger if it is merely to the fact that he identified the body as his son.

[Prosecutor]: I intend to offer him to testify as to (1) when he last saw his son and (2) what he was wearing and (3) where he made identification of the body and also (4) what type of student his son was. [parentheticals added]

[Defense Counsel]: I would stipulate to the testimony as to (3) his identifying his son, but I don't see any relevancy to (1) the last time he saw his son and (2) what he was wearing, and I would object. [parentheticals added]

Judge Adams: Does the Commonwealth wish to call him in light of the stipulation?

[Prosecutor]: Yes.

Judge Adams: We will permit you to call him. We would overrule the objection.

It is apparent from this record that the prosecutor offered this witness to address four factual matters. The appellant's trial counsel was willing to stipulate to one of these points and objected to two others. The fourth matter, which is the issue here, was not opposed then or later and, therefore, has been waived.

However, it is of little import that the appellant did not technically preserve his objection because the substantive argument supporting it is meritless. That argument points to the following testimony as prejudicial to the appellant.

Q. [Prosecutor]: Mr. Smithburger, what kind of student was your son?

A. Well, he went to Tech School and he passed his welding class.

Q. How would you describe your son—was he a troublemaker?

A. No, never a troublemaker.

Q. How was he as far as listening?

A. He listened pretty good.

Q. If someone were to tell him something, would he do it?

A. Yes, he would.

Q. I believe you told the police that he was in special education?

A. Yes.

[Prosecutor]: I have no further questions.

Evidence which has the effect of arousing sympathy for a crime victim is prejudicial and inadmissible when otherwise irrelevant. *Commonwealth v. Story*, 476 Pa. 391, 402, 383 A.2d 155, 160 (1978). In this case it is not apparent that the above testimony had the threshold impact of evoking sympathy for the victim in the minds or hearts

of the jurors. The assessment of the trial court was that the "testimony was delivered in a matter-of-fact tone and was not done in a manner which would inflame the jury." Slip op. at 36. The mere characterization of the victim as an individual having a learning disability does not make his homicide more, or less, heinous.

Furthermore, this evidence was probative of the victim's passive nature and thereby lent credence to the Commonwealth's account of events prior to his death. Specifically, evidence of the victim's passiveness served to explain, at least in part, why Smithburger remained prone in the field while Blystone was at his automobile discussing with his companions the necessity of killing him. The appellant himself in his taped statement admitted that he was surprised by Smithburger's obedience.

> I thought I was going to have to chase him through the field when I went back. I thought for sure this mother-f.....r ain't going to lay there, but I wanted to warn them—you know, Jackie and George—I wanted to warn them that I was going to waste him—I went back. I went back just expecting this mother-f.....r to be through the fields. I had to laugh.

The testimony of Mr. Smithburger, being more probative than prejudicial, was properly allowed by the trial court. *See Commonwealth v. Ulatoski,* 472 Pa. 53, 63 n. 11, 371 A.2d 186, 191 n. 11 (1977). *See also Commonwealth v. Story, supra,* 476 Pa. at 402, 383 A.2d at 160.

In addition to allegations of error on the part of the trial court, the appellant asserts that his trial counsel was ineffective because he failed to investigate and present an alibi defense. Blystone, represented by a different attorney, presented this complaint to the trial court long after the jury rendered its verdicts and set the appropriate penalty for the homicide conviction. After a post-trial hearing conducted to air this grievance the trial court determined that appellant's argument was meritless. We concur.

■■■ Initially, we note the appellant did not comply with the mandatory notice provision of the rule governing the presentation of an alibi defense, which provides:

C. Disclosure by the Defendant

(1) *Mandatory.*

(a) Notice of Alibi Defense. A defendant who intends to offer the defense of alibi at trial shall, at the time required for filing the omnibus pretrial motion under Rule 306, file of record notice signed by the defendant or the attorney for the defendant, with proof of service upon the attorney for the Commonwealth, specifying intention to claim such defense. Such notice shall contain specific information as to the place or places where the defendant claims to have been at the time of the alleged offense and the names and addresses of witnesses whom the defendant intends to call in support of such claim.

Pa.R.Crim.P. 305.C.(1)(a). The consequences to a defendant who ignores the notice provision are also made clear in the rule:

(d) Failure to File Notice. If the defendant fails to file and serve notice of alibi defense or insanity or mental infirmity defense as required by this rule, or omits any witness from such notice, the court at trial may exclude the testimony of any omitted witness, or may exclude entirely any evidence offered by the defendant for the purpose of proving the defense, except testimony by the defendant, or may grant a continuance to enable the Commonwealth to investigate such evidence, or may make such other order as the interests of justice require.

Pa.R.Crim.P. 305.C.(1)(d).

This was not, however, an instance in which the alibi defense was barred simply because of a failure to comply with the Rules of Criminal Procedure. Blystone chose to present no defense whatsoever after the conclusion of the Commonwealth's evidence. At that point in the proceedings the trial judge conducted a colloquy out of the jury's presence to ensure that the appellant understood his right to advance evidence on his behalf. The appellant gave no

indication to the trial court that an alibi defense was feasible. Consequently, there was not even an opportunity for the court to abuse its discretion in the application of the alibi defense rule, Pa.R.Crim.P. 305.C.(1).

Additionally, it is apparent from the record of the post-trial hearing that Blystone's alibi was a fabrication. At that proceeding the appellant waived the attorney-client privilege of confidentiality existing between him and his trial counsel. Trial counsel then testified that the testimony of the alibi witnesses would be contrary to the facts as recited to him by Blystone. In other words, the alibi witnesses would be perjuring themselves. It was also apparent that Blystone did not tell his trial counsel of the possibility of establishing his presence elsewhere at the time of the crime until after the Commonwealth rested its case.

During the post-trial hearing the trial court, through its own diligence, went so far as to locate one of the appellant's alibi witnesses and import her from West Virginia for the purpose of testifying at the proceeding. After hearing the witness' testimony, and juxtaposing it with that which she had rendered in a separate prosecution arising from the same incident, the trial court found the witness was not credible. Slip op. at 56.

This Court will not label counsel ineffective for failing to suborn perjury. Therefore, the appellant's argument is meritless.

■ In addition to the claims already aired, the appellant raises three arguments challenging the constitutionality of the death penalty. One of these arguments is couched in terms of error by the trial court. The appellant asks: "Whether the trial court erred in denying the defendant's motion for an evidentiary hearing to present testimony concerning the prosecution-proneness of the jury that convicted him?" To accept the appellant's contention of error, would be to accept the worth of his substantive argument to the effect that death qualified juries are prosecution-prone. We will not do this. *Commonwealth v. DeHart,*

*supra,* 512 Pa. at 250–53, 516 A.2d at 664–665. *See Lock-hart v. McCree, supra.*

 The appellant next asserts that the death penalty statute is unconstitutional under both the United States and Pennsylvania Constitutions because of its mandatory language. The part of the statute operative in this instance states: "the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance ... and no mitigating circumstance," 42 Pa.C.S. § 9711(c)(1)(iv). We will not dwell on this issue beyond noting that the appellant's argument was expressly refuted in the case of *Commonwealth v. Peterkin, supra,* 511 Pa. at 326–28, 513 A.2d at 387–88.

 The appellant also argues that this Commonwealth's death penalty sentencing statute violates his Eighth Amendment protection against cruel and unusual punishment [19] because the operative aggravating circumstance in this case [20] is overbroad, arbitrary, and does not differentiate those murders which justify the penalty from those which do not.

 The statutory procedure governing the imposition of the death penalty in this Commonwealth channels the discretion of the sentencing body to prevent the arbitrary and capricious imposition of capital punishment. *Commonwealth v. DeHart, supra; Commonwealth v. Zettlemoyer, supra.* Since we have previously held that the sentencing system on its face does not operate in an arbitrary or capricious manner, Blystone cannot prove a violation of his

**19.** The Eighth Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), *reh. denied,* 371 U.S. 905, 83 S.Ct. 202, 9 L.Ed.2d 166 (1962).

**20.** The pertinent portion of the sentencing statute states:
 (d) Aggravating circumstances.—Aggravating circumstances shall be limited to the following:

 (6) The defendant committed a killing while in the perpetration of a felony.
 42 Pa.C.S. § 9711(d)(6).

constitutional rights by mere assertions that other defendants who were similarly situated did not receive death sentences. *See McCleskey v. Kemp*, 481 U.S. 279, 305, 107 S.Ct. 1756, 1774, 95 L.Ed.2d 262 (1987), *reh. denied,* — U.S. ——, 107 S.Ct. 3199, 96 L.Ed.2d 686 (1987). The focus of his challenge must, therefore, be upon the sentencing mechanism as it has been employed to render his death sentence.

A sentence of death is not merely the product of evidence which supports a particular aggravating circumstance. The Commonwealth must first prove beyond a reasonable doubt that an aggravating circumstance applies to the particular homicide. Thus, an aggravating circumstance has no relevance in the abstract; it can only be applied against an individual defendant by the particular sentencing body weighing the evidence before it. Should the fact-finder determine the Commonwealth has satisfied its burden of establishing the aggravating circumstance, then, and only then, does a penalty of death become cognizable. Therefore, the establishment of an aggravating circumstance represents the crossing of a threshold from a condition in which the sentencer cannot render a verdict of death to one in which it must. 42 Pa.C.S. § 9711(c)(1)(iv).

However, an individual may thwart the imposition of the death penalty by offering evidence of mitigating circumstances concerning his character, record, and the circumstances of the offense. 42 Pa.C.S. § 9711(e). In this manner the fact-finder may consider any relevant circumstance that could cause it to decline to impose the death penalty. A balancing of aggravating and mitigating factors which favors the defendant cannot be reversed, as that determination by the sentencing body is unreviewable. On the other hand, a sentence of death produces an automatic appeal to this Court in which we will curb abuses of the trial or sentencing proceeding.[21]

**21.** The Sentencing Act provides:

(h) Review of death sentence.—

■■■■ There is no question that the death penalty may be constitutionally imposed for a murder committed in the course of a planned robbery. *McCleskey v. Kemp, supra,* at 305, 107 S.Ct. at 1774; *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), *reh. denied,* 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976). In this case the jury expressly found this aggravating circumstance to exist and, thus, Blystone's case rose above the level below which the death penalty may not be imposed. Since he refused to present any evidence of mitigation, there was nothing to block that passage. Based on its finding that there existed one aggravating and no mitigating circumstance the jury returned a sentence of death. We find no fault with the sentencing body's performance of its duty.

■■■■ Finally, it is the practice of this Court to examine, *sua sponte,* whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant. *Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). In examining this claim we emphasize that the statute requires a verdict of death in those instances in which the jury finds one or more aggravating circumstances and no mitigating circumstance, 42 Pa.C.S. § 9711(c)(1)(iv). Thus, by the very

(1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.

(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence.

(3) The Supreme Court shall affirm the sentence of death unless it determines that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

42 Pa.C.S. § 9711(h).

terms of the statute the death penalty cannot be considered excessive to the circumstances of this defendant.

Further, we note that the continuing study of capital cases maintained by the Administrative Office of Pennsylvania Courts (AOPC) reveals that Blystone's punishment is not out of proportion to that imposed on similarly situated defendants.[22]

For the foregoing reasons, we sustain the convictions of murder of the first degree, robbery, and criminal conspiracy to commit those offenses. The sentences of death and ten to twenty years imprisonment are affirmed.[23]

ZAPPALA, J., files a dissenting opinion in which LARSEN, J., joins.

## APPENDIX

THE FOLLOWING IS AS THE TAPE WAS HEARD BY THE COURT REPORTER:

BLYSTONE: Do you remember the body they found along the road next to the Redhead—along the Brownfield Road? Remember the body they found?

MILLER: Huh-uh.

BLYSTONE: Smithburger—found him laying in a field shot six times.

MILLER: I don't read the f_____g paper.

BLYSTONE: Shot six times in the head.

MILLER: Six times?

BLYSTONE: Six times in the back of the head.

MILLER: Must have been a strong son-of-a-b____, huh?

22. The AOPC study indicates that in those instances in which sentencing bodies have found one or more aggravating circumstances to exist in the absence of any mitigating circumstances, a sentence of death was returned in the overwhelming majority of those prosecutions.

23. The Prothonotary of the Western District is directed to transmit to the Governor a full and complete record of the proceedings of this case both in the trial court and this Court. 42 Pa.C.S. § 9711(i).

BLYSTONE: They found five bullets in his head and a fragment of one and they said he had on a blue suit, a three piece suit, and lived up on the mountains, and they found him about a mile from the Redhead. Remember?

MILLER: Scott, I don't read the God damn paper.

BLYSTONE: Tell you what—go to the library.

MILLER: I am not going to no f\_\_\_\_g library.

AT THIS POINT JUDGE ADAMS ASKS THE OFFICER TO STOP THE TAPE. HE THEN INQUIRED OF THE JURORS WHETHER OR NOT THEY COULD HEAR THE TAPE AND SOME OF THE JURORS RESPONDED THAT THEY COULD HEAR PORTIONS OF IT BUT SOME OF THE PORTIONS THEY COULD NOT UNDERSTAND.

JUDGE ADAMS: The tape gets stronger as it goes along. You may continue, officer.

OFFICER THEN CONTINUES TO PLAY THE TAPE, AND THE FOLLOWING IS THE TAPE AS HEARD BY THE COURT REPORTER:

BLYSTONE: Me and Jackie—you got to keep this quiet— we were out one night, and we didn't have any money, and I had a .22 and I kept telling them that we got to get money. We tried all kinds of s\_\_\_ and that wasn't working so I said "f\_\_\_ it—I'm going to just drive up and blow somebody's brains out and take their wallet." George was with us. Don't burn me.

MILLER: You think I'm going to f\_\_\_\_g go to the state cops, man, and tell them "hey, look, and all this and that, I know this about Scott Blystone."

BLYSTONE: Don't even tell Jackie that I told you this or she'll f\_\_\_\_g flip. Anyway, there's this guy hitchhiking (inaudible to reporter) and it was about 11:00, and we picked him up. Jackie is sitting in the middle, and so he got in, you know, and he said he was going up over the mountains, and I said "that's where we are headed." I said "we need gas money" and he said "well, I got a little bit." You know how everybody says they got a little bit.

MILLER: Yeh.

BLYSTONE: So I said "how much you got?" He said "not that much but I can give you something for gas" and then we pulled up to the foot of the mountain—that road that turns off from Hopwood.

MILLER: Taste this man. This is bad.

BLYSTONE: I pulled off and I said "I got to make sure, man, before I go up this mountain 'cause I ain't got gas to get back and then what the f___ would I do."

MILLER: Wait a minute, you picked this guy up?

BLYSTONE: Yeh, in Hopwood on Route 40. I knew what I was going to do. I told everybody what I was going to do.

MILLER: Before you did it?

BLYSTONE: Yeh. They thought I was bull-s_____g. Everybody thinks that Scott bull-s___s.

MILLER: Ain't that good apple pie?

BLYSTONE: It is pretty good.

MILLER: I told you you should have got one.

BLYSTONE: You don't believe this, do you?

MILLER: Go ahead.

BLYSTONE: He said something that ticked me off, you know, like "I can only give you a few dollars" or something like that, and so I pulled the gun out and stuck it around behind Jackie and I put the gun to his head and I said "get your f_____g hands on the dashboard," and then I started reaching in his f_____g coat. That's the part I got to leave out, that and one other part.

MILLER: Did he have a gun?

BLYSTONE: No, but I thought he did, and I almost splattered him right there in the car. That's when the car was wrecked—the back end was real f___d up, real identifiable. I told everybody what I had to do. So (inaudible to reporter) I said to him "get them on the dashboard, put them up there" and then we went out the Brownfield Road and stopped for a second. I told George—I said "you get ahold

of him until I get out of the car and come around to the other side." I didn't want this mother-f____r to get out and run, you know.

MILLER: George was holding him in the car, huh?

BLYSTONE: George was scared to death.

MILLER: He held him there, didn't he?

BLYSTONE: F_____g right.

MILLER: He didn't?

BLYSTONE: I went around the other side of the car and put the gun to him and said "get out." I went back in the field with him. "George, come on" I said, "help me." George kept f_____g around. Jackie told me that George was back there making excuses—"I got to light a cigarette" and "just a minute" and (inaudible to reporter) and "I'm getting out" and all this s____.

MILLER: He was scared.

BLYSTONE: In the meantime I had him back there searching him. If found his money (inaudible to reporter) which wasn't f_____g much at all.

MILLER: How much was it?

BLYSTONE: I guess I can tell you because the cops wouldn't know—$13.00.

MILLER: $13.00?

BLYSTONE: Yeh, unlucky mother-f____r, it was a Friday and he had $13.00. I said "where's the rest" and he said "that's all I got." I told him "lay down," and I said "you wait right here. I'll be right back." I said "don't move or I'll blow your f_____g brains out." He said "I ain't going nowhere."

MILLER: You going to eat these fries?

BLYSTONE: No, go ahead. So then I ran back to the car. I said "he has got" (inaudible)—I didn't know how much it was. I said "he has got about $15.00 on him."

MILLER: Ain't no wonder you don't want them, man; they are f_____g cold.

BLYSTONE: I said "he can identify us—he was looking." He kept looking. I kept telling him "close your f_____g eyes, you mother-f____r."

MILLER: When he was down on the ground?

BLYSTONE: No, when he was in the car. He kept looking at us, you know, and he was looking in the back seat and I said "shut your f_____g eyes, man." He'd go (some sort of sound), and I said "turn your f_____g head." He would turn his head like that, and I said "man, you're dead." So then I ran back to the car and told them "I got to kill him,"—said "can everybody handle it."

MILLER: You left him there and you ran back to the car?

BLYSTONE: He never moved. He thought I was there. (inaudible) I stepped around him, right, and I walked a little bit in a circle and I stopped. I didn't make no noise, and I said "don't think I am gone, mother-f____r," and then I f_____g tiptoed off, you know. I told them I said "I'm going to kill him." Everybody said "yeh, go ahead, kill him,"—you know, so I f_____g ran back there and got over top of him and I said "what kind of car were you in tonight?" He said "I wasn't driving, man." He said "I told you I don't have a car," and I said "what kind of car picked you up?" He said "all I know is it was green and the back end was wrecked." I said "goodbye" and he tightened up, and I f_____g wasted him. Blood splattered all over me, and then I came running back to the car—jumped in the car. Jackie had it in drive. I shot him six times. You should have heard it, man—pow, pow, pow, pow, pow, pow. Brains started oozing out of this f____. Every hole I would put in his head, brains would start oozing out each time I shot him, right?

MILLER: Uh-huh.

BLYSTONE: I found brains on my nose. Jackie picked them off my face that night. I jumped in the car, and the car was f_____g rolling. We went back to George's house and got the blood off me.

MILLER: I bet they was scared. They probably thought you was bull-s_____g.

BLYSTONE: I know. It's like they didn't believe me. I had blood all over me.

MILLER: Was George there?

BLYSTONE: Yeh.

MILLER: He was right there?

BLYSTONE: No, he didn't get out of the car. He never got out of the car. Then I ran back, and I didn't say nothing to him until later on and I said "man, you were supposed to be with me." Then Jackie told me what he was doing—he was stalling. I left some evidence back there. When I was searching him I pulled out a pack of cigarettes and I picked up the pack with my bare hand. We sat around (inaudible).

MILLER: Pack of cigarettes?

BLYSTONE: I know for two hours we sat at the house. I sat there and I said "man, they can't get the footprints— there is a million out there." "There ain't no scrapings under his nails or nothing, or under mine," and I said "we got all the blood off." I kept telling them "get that pack of cigarettes." I said "that's the only thing that can get me." I said "f___ it—we are going back down," and then we ran out of gas—we ran out of gas out there.

MILLER: Where at?

BLYSTONE: Right after we went back.

MILLER: You ran out of gas right there?

BLYSTONE: About 200 yards from it.

MILLER: Back towards the gas station?

BLYSTONE: Uh-huh.

MILLER: You didn't have far to walk then?

BLYSTONE: Huh-uh. Anyway, we got back there, and I told George—I said "look, the place might be staked out." I said "we are going to get out of the car like we are taking a p___," and I said "I'll take you over to the body and stand there and just keep talking—bull-s_____g" and then I said "you look over and notice and say 'hey, what's that' "?

MILLER: You like that apple pie?

BLYSTONE: Uh-huh. So we get over there, right—get out of the car.

MILLER: I'd like another bite of that mother-f___r too.

BLYSTONE: (inaudible to reporter).

MILLER: You should have bought one of these. You should have let me buy you one.

BLYSTONE: We get out of the car, pull our d___s out and start p_____g, and George says "what's that?"

MILLER: You didn't p___ on him, did you?

BLYSTONE: Huh-uh. George said "what's that—look" and we were talking nice and loud in case there was any cops in the bushes. He said "right there" and I said "I don't know" and I said "my God, it looks like a body" and George said "no, man" and I said "look, man, it is a f_____g body."

MILLER: In case there was somebody around?

BLYSTONE: (inaudible to reporter) went back there and said "if you ask me, George, I blew his head off, man."

MILLER: (inaudible).

BLYSTONE: So he said "my God, we had better call the police." I said "yeh, let's look for some I.D. and see if we can find out who he is." I started looking. I had this f_____g light—looking around.

MILLER: Just in case there was somebody around?

BLYSTONE: Right. I said "try to find some I.D. on him." I knew we were looking for the cigarette pack—couldn't find it nowhere. Then I remembered when he laid down— when I took the stuff off of him, I threw it down in front of him. I threw it down in front of him when he laid down— he laid straight down.

MILLER: On his face?

BLYSTONE: I said "George, it must be under his f_____g body" and we walked over. George put the light on this guy. I grabbed him by his f_____g coat, pulled him up—

moved him up, and man, he was nothing put a pool of blood. One eye was out and his f\_\_\_\_g eyebrows—his whole brow, man, was like real swollen—looked like somebody had beat him with a baseball bat,—cheeks were all swollen.. There was holes in them and coming out of his throat, and s\_\_\_, his teeth were in the ground. They were blown in the ground.

MILLER: Big time, huh?

BLYSTONE: This f\_\_\_r was done—he was a f\_\_\_\_g mess. I tell you he was drenched in f\_\_\_\_g blood. I picked the pack up and I stuck it in. I said "man, let's call the police." We jumped back in the car, went back to the house, and waited all night.

MILLER: You took that pack of cigarettes off of him?

BLYSTONE: We smoked them. They had blood on the filters and we smoked the f\_\_\_\_g cigarettes, and we waited right. We kept waiting and waiting to hear something on the TV or the radio.

MILLER: Were they "Kools," man?

BLYSTONE: No, I can't tell you what they were 'cause that's another thing too—they were unusual.

MILLER: I don't give a f\_\_\_.

BLYSTONE: Then we went back two or three hours later, right.

MILLER: You went back three times?

BLYSTONE: Twice.

MILLER: Oh.

BLYSTONE: I killed him and then we went back for the cigarettes, and (inaudible)—So we went back to the house, right, and we are sitting around listening and waiting—just f\_\_\_\_g waiting. I think about—

MILLER: You went back to George's house?

BLYSTONE: Uh-huh.

MILLER: After you done run out of gas?

BLYSTONE: Well, when we left there the second time when we got the f\_\_\_\_g cigarettes, we are going up the

f_____g road and the car goes (sound)—oh, f___, man, I put it in neutral and drifted it as far as I could and then pushed it over to the gas station, and then this dude got us some gas downtown.

MILLER: You must have been right up on top of the hill then?

BLYSTONE: Yeh—so anyway, about 11:00 the next day—

MILLER: Because I know you and George can't push that car up that f_____g hill.

BLYSTONE: Not uphill, no. It drifted a good ways. I was rolling. When I came out I was rolling. We were acting like we found a dead body. So the next day we all went to sleep for three or four hours, and got up and turned it on, and we were waiting and waiting—nothing, man—no TV, no radio, nothing. They had to find him. I said "they should have found him at the crack of dawn." Finally on WPQR "we interrupt this"—you know how they bull-s___— "body of an unidentified man found" I don't even think they said "shot to death"—they said where he was—that he was dead, and about an hour or so later then said that he was shot. Then it came out in the papers that he was shot six times in the head, and they kept talking about it on the radio.

MILLER: This next day?

BLYSTONE: Yeh. It was on TV and it was on the news— 6:00 news. It was in the paper for about three days that the State Police needed help in the slaying—that a man was shot with a .22 caliber pistol six times in the back of the head along Brownfield Road, and that he was 6-3 and weighed, I think, 195.

MILLER: Is that the gun we shot off my porch?

BLYSTONE: I wasted him, Miles. That mother-f____r, when I got over him, I was down—

MILLER: You still got that f_____g thing now?

BLYSTONE: That's why I told you I couldn't sell it—the murder weapon.

MILLER: I hope you got that mother-f----r put away.

BLYSTONE: I buried it. I bent down over top of him—

MILLER: Up there at your dad's house?

BLYSTONE: In the woods. I put it down to his head, and when I shot, man, the barrel was only this far from his face. Every time I fired, f-----g s--- would splatter in my f-----g face. I got up and ran back to the car, but they didn't believe it. Everybody was real (inaudible)—real calm 'cause all they could hear was shots. We went back—Jackie saw it—couldn't have been right from here to the car, and when George lit that lighter and I picked him up, you could see his face and he looked like a f-----g ghoul—like a mummy or something. His face was all f-----g swollen and black and blue. His eyes were clouded over. His f-----g teeth—blew all his f-----g teeth out, and about half of his jaw came off, but nothing ever happened. Nobody ever came to us. Nobody ever ask no questions—nothing—it's an unsolved murder.

MILLER: Man, oh, man.

AT THIS POINT THE TAPE WAS STOPPED.

JUDGE ADAMS: Officer, you may go into my chambers to adjust the tape.

THE OFFICER AND ATTORNEY SOLOMON GO INTO THE JUDGE'S CHAMBERS TO ADJUST THE TAPE. AFTER DOING SO, THE OFFICER AND ATTORNEY SOLOMON RETURN TO THE COURTROOM AND THE TAPE RECORDING, AS HEARD BY THE COURT REPORTER, IS AS FOLLOWS:

BLYSTONE: What I am trying to tell you, man, is—it's easy. It's f-----g easy, you know.

MILLER: To kill somebody?

BLYSTONE: To get away with it.

MILLER: Yeh, I guess so—like that—God damn.

BLYSTONE: It was wild. You should have seen it. You should have seen George give me that f-----g look. He was standing there p-----g. He was standing like this and he

was f——g looking, you know. (inaudible) When I turned him over I thought he was going to (inaudible) boom, boom, boom—I was ready to go again.

MILLER: You had it loaded up again, huh?

BLYSTONE: I would have man. It was—I was ready to go—I swear. Miles, this man is six feet. Jackie said—when he put his hand like this (inaudible), I said "put your hands on your head." He put them like this and his f——g hands curled clean down over his knees.

MILLER: He was a big dude?

BLYSTONE: I said "don't you move." I told him—I said "I'll splatter you all over this f——g car." He said "I ain't doing nothing." I said "don't you touch the doorknob—don't touch my girl." I said "don't you take your hands off your legs or I'll waste you"—and when I told him "goodbye"—

MILLER: He didn't try f——g nothing—he never tried to get away or nothing?

BLYSTONE: No. I thought I was going to have to chase him through the field when I went back. I thought for sure this mother-f——r ain't going to lay there, but I wanted to warn them—you know, Jackie and George—I wanted to warn them that I was going to waste him—I went back. I went back just expecting this mother-f——r to be (inaudible) through the fields. I had to laugh.

MILLER: So when you came back to the car you just f——g said "I'm going to waste the mother-f——r", and when you went back to him you said "I'm going to waste you" and he didn't—

BLYSTONE: No, I didn't tell him then.

MILLER: —f——g get up or nothing?

BLYSTONE: I didn't tell him then. I didn't tell him I was going to waste him them. I asked him what kind of car he was in and he said "all I know is it was green and it was wrecked in the back." I said "well, goodbye." He tight-

ened up—tensed up. I think he s___ himself. His whole body went rigid because I was sitting on him.

MILLER: You was sitting on him?

BLYSTONE: Sitting on his back, you know—had my knees across him, and I told him "well, goodbye," (inaudible)—the barrel. So I put it to his head and then pulled it off an inch and then I said "goodbye." He went like that, and that's the last move he made and I hit him.

MILLER: He didn't move after that?

BLYSTONE: He never moved.

MILLER: I guess not, man—f_____g six pieces of lead flying in your f_____g head.

BLYSTONE: Pow, pow, pow, pow, pow, pow. I jumped up, came running back. We went back to the house and Jackie said "what's that on your face" and I said "that a f_____g piece of his brain." She said, "oh, my God, brains." (inaudible)—and was playing with it and threw it in the ashtray—had to wipe my face of—had to take a shower and soak my clothes in cold water. You know that number 12 football jersey I had, the white jersey with the blue shoulders?

MILLER: Yeh.

BLYSTONE: That's the one I killed him in. I think I had these pants on too—I am not sure. These are jeans. I forget what it was.

MILLER: God damn. You f_____g (inaudible)—you just f_____g done it. You don't want none of this milkshake, do you?

BLYSTONE: (inaudible) There ain't nothing to getting away with something, you know. It's very easy. If you'd go—

MILLER: Wait until I throw this s___ in the back of the truck, man. I am not going to throw it down here. That's f_____g ignorant. I'll give this sandwich to Rover. Remember Rover? I hope it f_____g blows out all them papers and s___ you know.

BLYSTONE: If you know what you are doing, man, you can get away with anything, including murder. It ain't hard at all.

MILLER: God damn.

BLYSTONE: I knew the only way I could get caught is if somebody talked, but nobody's going to talk 'cause I'm going to kill them too.

MILLER: Yeh, no s____.

BLYSTONE: George—ever since then George has been like—

MILLER: Ain't you afraid that f_____g George might tell somebody?

BLYSTONE: No, see I told George that I'd waste him too. I said "I'll torture you." I told him I'd blow his f_____g c____ off and everything else if he opens up his mouth. Like (inaudible). He is an accessory to murder. He went back there and touched the body with me, and Jackie's an accessory.

MILLER: How did he touch it if he was holding the f_____g lighter?

BLYSTONE: He touched him. He was feeling around on the ground and around the body. I didn't want to touch it because of the evidence but I thought that is where the mother-f____r is. I said "it's under his body." When I took the s___ off of him I threw it on the ground, and then I told him to lay down on the ground, and he got down on his knees and got down. Sure enough it was right there. I rolled him over and it was under his f_____g chest, and I said "we got it—let's get the f___ out of here. Let's go call the police and then tell them about this body."

MILLER: You didn't call them though?

(BACKGROUND NOISE—INAUDIBLE TO REPORTER)

BLYSTONE: You ain't going to say nothing about this?

MILLER: What the f___ do you think—even if I did.

(INAUDIBLE TO REPORTER)

MILLER: You know, if I don't find a job pretty soon, man, I'm going to f___g go steal something.

BLYSTONE: Murder is a real f___g experience. It's wild. She thinks it's wild.

MILLER: Did she freak out?

BLYSTONE: No she's all right. She was worried for a few days. I was worried about her losing it, but she wasn't right there when I wasted him.

MILLER: She's still f___g involved.

AT THIS POINT THE TAPE WAS STOPPED BY THE OFFICER AND ADJUSTED.

JUDGE ADAMS: You may start the tape.

OFFICER STARTS TAPE AND THE TAPE RECORDING, AS HEARD BY THE COURT REPORTER, IS AS FOLLOWS:

BLYSTONE: George never believed me. When I used to say "I'll kill him" he'd look at me like "yeh, sure, okay," but now when I tell George "hey, I'll kill you," he looks at me like "this mother-f___r is going to kill somebody."

MILLER: He thinks you are for real, ain't it?

BLYSTONE: He thinks I'm for real.

MILLER: That you have the nerve?

BLYSTONE: When I tell him that I'll kill him, it don't mean I'm going to "beat you up or hurt you; it means I'm going to kill you," and Jackie looks at me different, you know.

MILLER: The only thing I'm really f___d up about, Scott, is—

BLYSTONE: It don't make you feel bad, Miles. It don't make you feel like an ogre.

MILLER: You don't dream about it or nothing, huh?

BLYSTONE: No. We laugh about it. Miles, it gives you a realization that you can do it, man.

MILLER: And get away with it.

BLYSTONE: You can walk up and—

MILLER: I hope this ain't your mom.

BLYSTONE: You can walk and blow somebody's brains out and you know that you can get away with it. It gives you a feeling of power, self-confidence, you know. Like, I mean I had confidence in myself before because I did it, but Jackie and George—they had doubt in their minds and I said "the mother-f____r does this, I'm going to kill him," but now when I say it to them—

MILLER: You just did it to prove it to them?

BLYSTONE: No, it was necessary. The guy could identify us, you know. It proved a point at the same time. He saw my face, Jackie's face, George's face, and he saw the car, you know, and we talked to him for five minutes before I even pulled the gun, and he was looking at us and all this s____.

MILLER: That freaks me out, man, that he didn't even try to get away.

BLYSTONE: He was so scared. When I was searching him, his body was shaking.

MILLER: He acted like he was stupid, man.

BLYSTONE: He might have tried to get away, you know, but like I said, I walked away from him out to where I could walk without making no noise, and I stood there for a minute—stood there, and I didn't make a sound and he didn't move, man. Then I made a noise and said "don't think I'm gone." I said "I'm right here. You move and I'll kill you." Then I went back to the car and I said "look, I got to go back there and kill him," and I said "does anybody have any f____g beefs,"—no, kill him.

MILLER: Everybody said "kill him," huh?

BLYSTONE: Yeh. I ran back to the f____g guy and bent over him.

MILLER: And George even said "kill him?"

BLYSTONE: Yeh, George said "kill him."

MILLER: God damn.

BLYSTONE: And I f____g killed him—got back in the car

MILLER: You think he wouldn't say nothing because he didn't even want to go out with you.

BLYSTONE: He wanted to come. He run his mouth, like I am saying.

MILLER: He didn't want to go the second time?

BLYSTONE: To go back to see the body, yeh, he wanted to, but once he saw the body he realized. I don't know where he though the blood might have come from—his brains, or you know, but it didn't him him, and when he was standing there p_____g, Miles, his eyes were like—

MILLER: Glued on the guy?

BLYSTONE: He'd look at the guy and then look at me— (inaudible) and then when we lifted him up and George seen (inaudible).

MILLER: He must have had a lot of blood on him, all over his clothes and s___?

BLYSTONE: Right—blew his eye out—it was all over him.

MILLER: You should have took his jacket, man, to keep your ass warm (inaudible). I would have if I'd killed so somebody, man (inaudible).

BLYSTONE: (Inaudible), and like I said, the weirdest thing was his f_____g eyebrows. It looked like somebody took this f___r and beat him with a baseball bat in the face. The concussion, man, from them bullets hitting him from the back and then coming up and slamming against his skull and cheekbones and s___ and roof of the mouth, it looked like something off of a horror movie,—a monster. His eyebrows were out to here, his f_____g cheekbones were out to here, his nose was real swollen and part of it was blown off—his teeth were gone. It blew his teeth—you could see his teeth sticking in the ground.

MILLER: Wasn't the wind blowing or anything that night to blow the f_____g light out in your lighter?

BLYSTONE: It didn't blow it out. We both had a lighter. We were looking around like we were looking for I.D., but we wasn't.

MILLER: God damn (inaudible).

BLYSTONE: I saw the jacket—Dalton Smithburger—but don't tell nobody because they might be related, you know. A guy might blow your f_____g head off for just talking about.

MILLER: Yeh, I imagine—no s___.

BLYSTONE: He lives up in Farmington, I think. He lives up on the mountain somewhere—Farmington, Chalk Hill, or Markleysburg.

MILLER: Did he freak out when he seen you wasn't taking him up over the mountain?

BLYSTONE: Yeh, when I saw him there on that road there I was checking him out, you know, and I pulled over and he said "heading for the mountain" and I said "hey, we are going up there too" and he said "that's good" and I said "but look I need some cash" and he said "well, I don't have much money." I pulled off down that road and then I said "look, if I go up this mountain I got to have some money because I won't be able to get back." I said "I don't mind taking you up but . . ."

MILLER: When did you put the f_____g gun on him, man?

BLYSTONE: I'll tell you. I told him I was going to take him up because we were going ourselves, but I said "we got to have a way back," and he said "well, I got a few dollars on me," and I said "I don't know." He said "I can give you a few for gas" and then he started getting in his jacket and then I reached around Jackie and I said "put your f_____g hands on the dashboard," and he said "oh, oh" and I said "put your f_____g hands on the dashboard." I kept telling him, I warned him—I said "the more you open your eyes, the more trouble you are going to be in." He kept f_____g trying, man. He kept sneaking looks. He'd see a lightpole coming by, you know, through his eyelids, and he would look up and look around to see where he was, and I said "mother-f____r, shut your f_____g eyes, man." I knew when I pulled the gun I was going to kill him (inaudible). He saw the back of the car, you know.

MILLER: When did he do that?

BLYSTONE: When we picked him up. He came from the back and he could see it was a green Dart with a a f_____g demolished rear end, and that ain't hard to f_____g identify, and I told everybody—I said "look, if I would have killed that mother-f____r, we would be in jail right now." (Inaudible) All the guy had to do—he didn't have to say it was a Dart or Dodge. All he had to do was to say a green car with a mashed rear-end and they would pick me up as the driver.

MILLER: Yeh, 'cause there ain't none around.

BLYSTONE: Yeh, take me in front of him and he will say "that's the f_____g guy right there—the guy who robbed me," so I told them the only think to do was to f_____g kill him. I said "do you want to end up in jail?" Believe me, if he was alive we'd all be in jail for armed robbery (inaudible). That's why I don't want to f___ around any more. If I think that mother-f____r is going to identify me, or his being alive is going to hope me get caught or if I ain't going to have time to get away or something, I'm going to kill him. Then I know I can take my time. The next job I am thinking about doing—if I murder this guy, my intention is to dig a grave, but it was getting dark, and you called and Jackie called. I was going to dig one because I am ready to do the job which would help get my house, my apartment, have enough money for Christmas and (inaudible).

MILLER: I wish the f___ you'd have sold me that gun, man. You f_____g blew my job of making ten or twenty bucks.

BLYSTONE: Miles, I can't. It is a f_____g murder weapon, you know.

MILLER: It ain't doing no good out there, man.

BLYSTONE: No, but (inaudible) rather it not be used.

MILLER: Them guns, man—(inaudible) there is a left twist and there is a right twist, okay?

BLYSTONE: Most is right-twist.

MILLER: How many of them is there around that's got a right twist or a left twist? I mean, God damn, man, how in the hell can they match that up?

BLYSTONE: They have records of those bullets, okay. They did an autopsy on the guy. They have prints of those bullets, okay, in the unsolved crime files. Every time that a .22 is confiscated, they are going to try to match it to who fired it, and they match it. When they match it, whoever has that gun is going to be charged with murder.

MILLER: How in the hell do you know if you got a right twist or a left twist?

BLYSTONE: Most guns have a right-hand twist. Very few guns have a left-hand twist. (Inaudible) have them. Most of them is right, but the bullet is—it really don't matter—right or left-hand twist. More what they look for is rifling grooves; you got (inaudible) grooves plus a firing pin. Every firing pin hits a case at a certain spot, like off-center, to the left, to the right, low or high or (inaudible) takes a certain shape of impression. With an automatic, with a .45—a lot of people don't know this—when you chamber a .45 you throw your clip in there—chamber one, and that fires—well, if you fire or whatever, when you eject that f....g thing, you leave what is called "chamber marks" on your casing. They can identify—they can match the gun up with the chamber it came out of with the bullets just by the little scratches and s... because every chamber puts a different mark on it—every firing pin puts a different mark (inaudible). A lot of people think "well, I'll change the barrel and they will never know," but they will match the firing pin and the chamber, especially in an automatic. Same thing with bolt rifles. If you had a microscope, you could look, chamber six or seven rounds, jack them out and line them up on a microscope and see if they all match up, scrape marks, everything.

MILLER: So even if they did find that gun—let's say they did find that God damn gun—I am getting ready to take off, man.

BLYSTONE: I want to take a p.....

MILLER: Even if they did find the gun—that's not saying that they can f____g match it up according to what they say.

BLYSTONE: They can.

MILLER: They can—how?

BLYSTONE: What they do, they have it on file, man; it is like an x-ray.

MILLER: Inaudible.

BLYSTONE: What they do is when they got a murder, they will take pictures of the bullets.

MILLER: Inaudible.

BLYSTONE: (Inaudible)—and every time they find a .22, and they confiscated it for murder, it will go to the unsolved cases (inaudible) with .22's. They are going to go through the .22 unsolved murders and they are going to fire a bullet into those ballistic (inaudible) and all they got to do—they probably got 20, 30 unsolved .22 murder cases, right—they just take it and check it, and when they get one, you are—(inaudible).

MILLER: I'm going to take off, man (inaudible)—I don't know whether it does any good whether I go home or not, man. I go home and she's (inaudible) and I go to Frank's, you know what I mean, because she is always there. Either she is there, or I go there and Frank and them tell me that she just left, and I know they are lying, you know what I mean—I know they are lying because I'll sit up the road sometimes and smoke a cigarette because I figure that I'm going to go home and she is not going to be there, and then tell me bull-s___ like that, and guaranteed, man, I've stood up the road and smoked a cigarette. Didn't you see her? Bull-s___; that's bull-s___ man.

AT THIS POINT THE OFFICER TURNS OFF THE TAPE.

ZAPPALA, Justice, dissenting.

Because I disagree with the majority opinion's conclusion regarding the constitutionality of the Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S. § 5701 et. seq., I must dissent.

496

Since the majority sets forth the actual provisions of the Act, it is only necessary to summarize the Act. Under the Act, with the consent of a participating individual, the government may electronically eavesdrop upon a person using a body tap upon the approval of the Attorney General, the District Attorney or their enumerated authorized agents. Noticeably missing from the Act is a requirement that a disinterested judicial officer review the facts to ascertain whether probable cause exists for the intercept. It is the failure to provide for the later requirement which causes me to conclude that this part of the Act is unconstitutional. The consensual interception authorized by § 5704 amounts to a search and seizure requiring either a warrant or probable cause as required by Article I, section 8 of our Constitution.

There is no question that the interception of an oral communication is considered a "search and seizure" as those terms are constitutionally defined under both the federal and state constitutions. *See, Katz v. U.S.*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Commonwealth v. White*, 459 Pa. 84, 327 A.2d 40 (1974). As the majority correctly points out, in interpreting the Fourth Amendment's protection against unreasonable searches and seizures, the United States Supreme Court has taken the approach that one party consensual interceptions do not violate that provision since an accused waives his "expectation of privacy" by conversing with another party. In short, the United States Supreme Court and the majority can discern no difference between communicating with the police informant who in turn reports to the police and surreptitiously recording the conversations directly by interception. This analysis embodies the proposition that the key factor to be considered in a wire intercept is whether the individual has a "legitimate expectation of privacy" and whether he has waived that expectation by disclosing information to any other party. While on the surface the majority's reliance upon the federal court's position seems to have merit, closer analysis reveals that blind adherence to this proposition is erroneous.

In its rush to adopt federal jurisprudence to support its position, the majority merely pays lip service to the admonitions of Mr. Justice Brennan of the United States Supreme Court which we heeded and embraced in *Commonwealth v. Sell,* 504 Pa. 46, 49, 470 A.2d 457, 459 (1983):

> [T]he decisions of the Court are not, and should not be, dispositive of questions regarding rights guaranteed by counterpart provisions of state law. Accordingly, such decisions are not mechanically applicable to state law issues, and state court judges and the members of the bar seriously err if they so treat them. Rather, state court judges, and also practitioners, do well to scrutinize constitutional decisions by federal courts, for only if they are found to be logically persuasive and well-reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees, may they properly claim persuasive weight as guideposts when interpreting counterpart state guarantees.

In refusing to adopt the United States Supreme Court abolition of "automatic standing" under the Fourth Amendment of the Federal Constitution in *Sell,* we reaffirmed our prior holding that the:

> state may provide through its constitution a basis for the rights and liberties of its citizens independent from that provided by the Federal Constitution, and that the right so guaranteed may be more expansive than their federal counterparts. (Citations omitted)

*Commonwealth v. Tate,* 495 Pa. 158, 169, 432 A.2d 1382, 1387 (1981). In *Sell,* we then analyzed the federal case law limiting standing under the Fourth Amendment against the evolution of protected liberties guaranteed by Article I, section 8 of our own constitution and had no problem in rejecting the federal analysis of "automatic standing" under our comparable constitutional clause.

It is also important to note that in *Commonwealth v. Sell, supra,* we upheld the overriding importance of "privacy" under our constitution:

In construing Article I, section 8, we find it highly significant that the language employed in that provision does not vary in any significant respect from the words of its counterpart in our first constitution. The text of Article I, section 8 thus provides no basis for the conclusion that the philosophy and purpose it embodies today differs from those which first prompted the Commonwealth to guarantee protection from unreasonable governmental intrusion. Rather, the survival of the language now employed in Article I, section 8 through over 200 years of profound change in other areas demonstrates that the paramount concern for privacy first adopted as a part of our organic law in 1776 continues to enjoy the mandate of the people of this Commonwealth.

504 Pa. 65, 470 A.2d 467. Thus, unlike our federal counterparts, the right to privacy has been elevated to a paramount right guaranteed to every citizen of this Commonwealth. This paramount status was even acknowledged by the legislature in defining an "oral communication" under the Act.

**"Oral communication."** Any oral communications uttered by a person possessing an expectation that such communication is not subject to interception under circumstances justifying such expectation.

18 Pa.C.S. § 5701. If a person has a legitimate expectation of privacy, that paramount right should not be infringed upon without a corresponding justification.

Both the majority and the United States Supreme Court adhere to the view that a "person cannot have a justifiable and constitutionally protected expectation that a person with whom he is conversing will not then or later reveal the conversations to the police." (Citations omitted) (Slip Opinion, p. 12). The majority adopts the federal rational without offering any persuasive argument for doing so. Under the majority view, a person could *never* be sure of having a confidential conversation with another. Communicating in and of itself would waive any right of privacy. As is evident, such an approach has a chilling effect, relegating

the right of privacy to nothing more than a useless ideal which could only be exercised when one is alone.

I find comfort and support for my position in this appeal from a recently decided decision of the Supreme Court of Oregon. *See State of Oregon v. Roger Jonathan Scott Campbell,* 306 Or. 157, 759 P.2d 1040 (1988); Accord, *Commonwealth v. Blood,* 400 Mass. 61, 507 N.E.2d 1029 (1987) (Similar Massachusetts interception statute held unconstitutional as being unreasonably intrusive to impose risk of electronic surveillance on every act of speaking aloud to another person). In *Campbell,* the court was faced with the question of whether or not under its state constitution, police use of a radio transmitter to locate a private automobile to which the transmitter had been surreptitiously attached is a "search or seizure". In rejecting the state's argument that the court should embrace the decisions of the United States Supreme Court which validated such a use, the court boldly disassociated itself from the United States Supreme Court's decisions allowing such a monitoring, *United States v. Knots,* 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), and *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) because the United States Supreme Court's interpretation in those cases did not comport with the interpretations of the Oregon Supreme Court regarding search and seizure and privacy protection as set forth in Article I, § 9 of the Oregon Constitution. After finding that privacy is an interest protected by Article I, § 9 of its state constitution the court discussed blind adherence to federal jurisprudence.

Even were the provisions identical, this court would nonetheless be responsible for interpreting the state provision independently, though not necessarily differently. Majority opinions of the Supreme Court of the United States may be persuasive, but so may concurring and dissenting opinions of that court, opinions of other courts construing similar constitutional provisions, or opinions of legal commentators. **What is persuasive is the reasoning, not the**

**fact that the opinion reaches a particular result.** (Emphasis supplied)

*Oregon v. Campbell,* 306 Or. at 1464–65 fn. 7, 759 P.2d at 1044 fn. 7.

After a thorough review resulting in the rejection of the United States Supreme Court's reliance on reasonable expectation of privacy analysis, the Oregon Court considered the argument that information legitimately available through one means may be obtained through any other means without engaging in a search. In the court's poignant rejection of that premise it determined that:

> [t]he constitutional provisions against unreasonable searches and seizures do not protect a right to keep any information, no matter how hidden or "private", secret from the government. (Citations omitted) What the provisions forbid are unreasonable searches and seizures, i.e., certain acts of the government. Article I, section 9 "presents the police with a web of rules that are meant to protect the privacy interests of 'the people', and the police violate section 9 if and only if they violate these rules." *State v. Tanner,* 304 Or. [312] at 320 [745 P.2d 757]. Whether police conduct is a search does not turn on whether its object could be discovered by conduct that is not a search. For example, in *State v. Lewis, supra,* the defendant exposed himself to public view through his living room. This Court held that the police officers did not engage in a search by photographing him from a house across the street with a 135 m.m. camera lense, which provided only minimal enhancement of what could be observed with the unaided eye. Nonetheless, *the police officers would have engaged in a search had they entered his living room to observe what could be observed from the street.* Similarly, if an undercover police officer is invited into a home and observes illegal conduct, the officer has not committed a search, but an unconsented entry into the home by other police officers to observe what the undercover officer could or did not observe *would be a search.* The issue is not whether what the

police learned by using the transmitter in this case was "exposed to public *view*", but whether using the transmitter is an action that can be characterized as a search.

．　　　．　　　．　　　．　　　．

The problem presented by this case is essentially much like that presented in *Katz*, which was whether using a hidden listening device placed in a public place could be considered a search. Conversations in public may be overheard, but it is relatively easy to avoid such eavesdroppers by lowering the voice or moving away. Moreover, one can be reasonably sure of whether one will be overheard. But if the state's position in this case is correct, no movement, no location and no conversation in a "public place" would in any measure be secure from the prying of the government. There would in addition be no ready means for individuals to ascertain when they were being scrutinized and when they were not. That is nothing short of a staggering limitation on personal freedom. We could not be faithful to the principles underlying Article I, section 9 and conclude that such forms of surveillance were not searches.

*Id.* at p. 1466–71, 759 P.2d at p. 1045–49.

Even accepting arguendo, the majority's logic regarding the expectation of privacy, I am perplexed as to why a conversation between two nonconsenting persons is entitled to all the protections embodied in the federal amendment while a conversation with one consenting to eavesdropping does not. If the key element is the expectation of privacy, then the consent of one participant is insufficient. Unlike the majority, I fail to see the distinction between having the consent of one participant or none as the polestar in guaranteeing a fundamental right. Furthermore, I cannot accept the majority's conclusion that one who communicates to another does so at the expense of his privacy rights. Implicit in the right to privacy is the right to determine who benefits from your knowledge. Knowledge is as much a possessory right as the right to possess and protect our homes and personal property. An individual then may

desire not to expose his inner thoughts or ideals to the public at large which he may not trust, but only to selected individuals. Of course, he takes the risk that a friend may betray him and his confidences, but that risk is one that he individually and knowingly assumes. Under such circumstances, he voluntarily chooses to limit his privacy.

Finally, taking the majority's reasoning to its logical extreme, if there is no difference between directly intercepting oral communications and receiving and recording information from an informant, then there will be no difference in directly probing and tapping the innermost thoughts of individuals in the future with the advent of more sophisticated electronic equipment. If the ends justify the means and the goal is to prevent criminal activity at the expense of individual liberties, then, under the majority's interpretation, I see no way to prevent intercepting thoughts even before they are orally and publicly communicated.

Accepting the importance of the right to privacy, as the majority must, the issue still becomes whether the governmental intrusion is reasonable, not whether an individual possesses an expectation of privacy. We have specifically rejected the United States Supreme Court's analysis of the legitimacy of privacy as a key element in interpreting Article I, section 8 of this Commonwealth's Constitution. Instead, we have held that our primary concern is the reasonableness of the intrusion. *Commonwealth v. Sell, supra.*

In other areas of criminal law we have consistently held that a warrantless search or a search pursuant to a warrant must be based upon probable cause. To ensure an objective determination of whether the intrusion is supported by probable cause, we have required a disinterested judicial officer to review the facts either preliminarily, in the case of a search pursuant to a warrant, or subsequently, in the case of a warrantless search, to determine if sufficient facts were present to establish probable cause that criminal activity was occurring. This neutral determination suffices to protect a person from an unjustifiable intrusion. Under

§ 5704(2)(ii), however, the legislature has impermissibly taken the "probable cause" determination from the judiciary and given that determination to a law enforcement official who cannot be said to be either neutral or detached. In *Commonwealth v. Johnston*, 515 Pa. 454, 530 A.2d 74 (1987), we specifically rejected the approach now taken by the majority in balancing the individual and governmental interests to be protected in determining whether a search was reasonable. Instead, we held that a determination that probable cause existed for the search supported a finding that the search was reasonable. Without such a neutral determination the search would be unreasonable.

Based upon the foregoing analysis, I cannot accept the constitutionality of § 5704 of the Act. I am cognizant of the principles that a statute is presumed to be constitutional and that the legislature does not intend to promulgate unconstitutional legislation. 1 Pa.C.S. § 1922(3). However, when a statute so blatantly ignores a liberty entrenched in our body of laws for over 200 years, that presumption must necessarily fall. Unlike the Superior Court's approach in *Commonwealth v. Schaeffer*, 370 Pa.Super. 179, 536 A.2d 354 (1987), I cannot in good conscience redraft the statute to include a requirement so basic to our system of justice to achieve a desired result. *See* 1 Pa.C.S. § 1921(b). It is clear to me that given the importance of the right to privacy in our jurisprudence, as even acknowledged by the legislature in this Act, I cannot conclude otherwise than that the legislature did not intend for a disinterested objective determination of probable cause prior to intercepting oral communications. *See* 1 Pa.C.S. § 1921(a). Therefore, I would find Section 5704 unconstitutional and remand this matter to the trial court for a new trial during which the information obtained pursuant to the Act would be suppressed.[1]

LARSEN, J., joins in this dissenting opinion.

1. President Judge Cirillo of the Superior Court has written a rather lengthy and scholarly opinion on this issue in *Commonwealth v. Schaeffer, supra.* Except for his reasoning on the constitutionality of

§ 5704 of the Act, I note with approval his analysis of the issue and would incorporate his opinion into this one.