**Larry E. KOPKO, Sheriff of Warren County, Jacob Sack, Deputy Sheriff of Warren County, Rick Hernan, District Attorney of Warren County, William H. Romine, Sheriff of Mercer County, Mark D. Yassem, Deputy Sheriff of Mercer County, James Epstein, District Attorney of Mercer County, Steven A. Evans, Sheriff of Bradford County, Michael Van Kuren, Deputy Sheriff of Bradford County, Chris**

---

Burgert, Deputy Sheriff of Bradford County, R. Thomas Kline, Sheriff of Cumberland County, Dawn L. Kell, Deputy Sheriff of Cumberland County, M.L. Ebert, District Attorney of Cumberland County, Petitioners

v.

Jeffrey B. MILLER, in his official capacity as Commissioner of the Pennsylvania State Police of the Commonwealth of Pennsylvania, Respondent.

Commonwealth Court of Pennsylvania.

Argued Dec. 9, 2003.

Decided Feb. 20, 2004.

Vincent J. Grogan, Pittsburgh and Thomas W. King, III, Butler, for petitioners.

Barbara L. Christie, Harrisburg, and Leslie Ann Miller, Philadelphia, for respondent.

BEFORE: COLINS, President Judge, and McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, COHN, Judge, and SIMPSON, Judge.

OPINION BY Judge SIMPSON.

Before the Court in our original jurisdiction are cross-motions for summary relief filed by sheriffs, deputy sheriffs and district attorneys of Warren, Mercer, Bradford and Cumberland counties (collectively Sheriffs), and Jeffrey B. Miller, Commissioner (Commissioner) of the Pennsylvania State Police (PSP). We are asked whether sheriffs are "investigative or law enforcement officers" under the Wiretapping and Electronic Surveillance Control Act [1] (Wiretap Act) so they may receive training and certification from the PSP to conduct wiretap investigations.

For several reasons more fully discussed below, we conclude sheriffs are not authorized officers under the Act. First, although sheriffs possessed broad common law power, the authority to conduct wiretap investigations does not emanate from common law; rather, the authority to use wiretaps is statutory and does not extend to sheriffs. Second, our courts only endorse limited law enforcement functions for sheriffs,

such as effectuating warrantless arrests for offenses committed in their presence and filing citations for summary offenses. Finally, modern sheriffs are primarily charged with court-related functions rather than peace keeping duties.

This case began when five deputy sheriffs applied to the PSP for admission to the "Legal and Technical Aspects of Wiretapping and Electronic Surveillance" four-day training course (Course).[2] The applications were rejected because of uncertainty over the deputy sheriffs' authority under the Wiretap Act. Seeking reversal, Sheriffs contacted the Commissioner. The Commissioner declined to revisit the issue.

Sheriffs filed a petition for review in the nature of a complaint in equity seeking an injunction to compel the deputy sheriffs' admittance into the Course. Sheriffs also sought a permanent injunction precluding the Commissioner from rejecting applicants on the basis of their status as deputy sheriffs.[3] Thereafter, the parties filed cross-motions for summary relief.[4]

---

1. 18 Pa.C.S. §§ 5701–5781.

2. The Wiretap Act specifically provides for training and certification by the PSP:

 The Attorney General and the Commissioner of the Pennsylvania State Police shall establish a course of training in the legal and technical aspects of wiretapping and electronic surveillance ... [for] Commonwealth *investigative or law enforcement officers as eligible to conduct wiretapping or electronic surveillance under this chapter* ....

 18 Pa.C.S. § 5724 (emphasis added).

3. A hearing on the injunctive relief request was scheduled. Prior to the hearing, however, the parties reached an interim agreement approved by this Court that permitted the deputy sheriffs to attend the Course. The agreement further provided the Commissioner would not certify the deputy sheriffs under the Wiretap Act unless this Court determined they were "investigative or law enforcement officers" under the Act.

4. Pursuant to Pennsylvania Rule of Appellate Procedure 1532(b), "at any time after the filing of a petition for review in an ... original matter the court may on application enter judgment if the right of the applicant thereto is clear." When questions of fact are disputed, summary relief is not warranted. *Taglienti v. Dep't of Corr.*, 806 A.2d 988 (Pa.Cmwlth. 2002). As long as the dispute is a legal one, we are not required to deny summary relief. *Id.*

 An application for summary relief is properly evaluated according to summary judgment principles. *McGarry v. Pennsylvania Bd. of Prob. & Parole*, 819 A.2d 1211 (Pa. Cmwlth.2003). Summary judgment may only be granted in cases where the record shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *P.J.S. v. Pennsylvania State Ethics Comm'n*, 555 Pa. 149, 723 A.2d 174 (1999). We view the record in the light most favorable to the opposing party with any doubt as to the existence of an issue of materi-

■ Under certain circumstances, the Wiretap Act allows judicial authorization of the interception of wire, electronic or oral communications. 18 Pa.C.S. § 5708. Because the statute authorizes electronic surveillance, which infringes upon the right to privacy, it must be strictly construed. *Boettger v. Miklich*, 534 Pa. 581, 633 A.2d 1146 (1993); *Dance v. Pennsylvania State Police*, 726 A.2d 4 (Pa.Cmwlth.1999); *Commonwealth v. Doty*, 345 Pa.Super. 374, 498 A.2d 870 (1985).

In order to obtain wiretap authorization: [t]he Attorney General, or . . . a deputy attorney general designated in writing by the Attorney General, or the district attorney or . . . an assistant district attorney designated in writing by the district attorney of the county wherein the interception is to be made, may make written application to any Superior Court judge for an order authorizing the interception of a wire, electronic or oral communication by the *investigative or law enforcement officers* or agency having responsibility for an investigation involving suspected criminal activities. . . .

18 Pa.C.S. § 5708 (emphasis added).

The Act defines an "investigative or law enforcement officer" as:

[a]ny *officer* of the United States, of another state or political subdivision thereof, or of the Commonwealth or political subdivision thereof, *who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter* . . . .

18 Pa.C.S. § 5702 (emphasis added). Thus, the definition of "investigative or law enforcement officer" includes only those officers who are (i) empowered by law (ii) to conduct investigations of or to make arrests for (iii) offenses enumerated under the Wiretap Act. *Id.*

Wiretap investigations are restricted to certain serious predicate offenses. The "listed crimes" include violations of the Crimes Code;[5] the Tax Reform Code of

---

al fact resolved in favor of the non-movant. *Id.*

5. Officials may apply for a surveillance order to investigate: corrupt organizations; criminal homicide; murder; voluntary manslaughter; aggravated assault; terroristic threats; stalking; weapons of mass destruction; kidnapping; rape; involuntary deviate sexual intercourse; sexual assault; aggravated indecent assault; arson; causing or risking catastrophe; burglary; robbery; theft; bribery in official and political matters; threats and other improper influence in official and political matters; lotteries; gambling; pool selling and bookmaking; facsimile weapons of mass destruction; unlawful contact with a minor. 18 Pa.C.S. § 5708(1).

In addition, a surveillance order may be obtained for investigations into: manufacture, distribution or possession of devices for theft of telecommunication services; receiving stolen property; theft of services; theft by failure to make required disposition of funds received; unlawful use of computer; commercial bribery and breach of duty to act disinterestedly; rigging publicly exhibited contest; insurance fraud; dealing in infant children; perjury; witness or informant taking bribe; tampering with public records or information; intimidation of witnesses or victims; retaliation against witness or victim; obstructing administration of law or other governmental function; dealing in proceeds of unlawful activities; escape; prostitution and related offenses; obscene and other sexual materials and performances; and buying or exchanging Federal food order coupons, stamps, authorization cards or access devices. 18 Pa.C.S. § 5708(2).

Also, a surveillance order may be obtained for investigations into the following violations where the offense is dangerous to life, limb or property and punishable by more than one year of imprisonment: sales of unstamped cigarettes; possession of unstamped cigarettes; and counterfeiting. Offenses relating to organized crime are also predicate offenses under the Wiretap Act. 18 Pa.C.S. § 5708(3).

Conspiracy to commit any of the offenses outlined above may also serve as a predicate to obtaining wiretap authorization. 18 Pa. C.S. § 5708(4).

1971;[6] the Controlled Substance, Drug, Device and Cosmetic Act;[7] and Motor Vehicle Chop Shop and Illegally Obtained and Altered Property Act.[8]

There is no clear precedent that authorizes sheriffs to investigate or arrest for any of the serious predicate offenses listed in the Wiretap Act. Nevertheless, Sheriffs contend they are "investigative or law enforcement officers" within the meaning of the Act. Relying on a trilogy of Supreme Court cases, Sheriffs assert we should search for statutory language abrogating their broad common law power. Because the Wiretap Act contains no abrogating language, Sheriffs argue, they may enforce it based on their broad power at common law.

The Commissioner counters there is no authority, statutory or otherwise, to support Sheriffs' claim they are "investigative or law enforcement officers" as defined by the Wiretap Act. The Commissioner asserts Sheriffs lack authority to investigate or make arrests for the Act's predicate offenses.

## I. Supreme Court Trilogy

Through a trilogy of cases, the Pennsylvania Supreme Court sanctioned a sheriff's power to enforce the Vehicle Code[9] and file citations for summary offenses. *Commonwealth v. Lockridge*, 570 Pa. 510, 810 A.2d 1191 (2002); *Dep't of Transp., Bureau of Driver Licensing v. Kline*, 559 Pa. 646, 741 A.2d 1281 (1999); and *Commonwealth v. Leet*, 537 Pa. 89, 641 A.2d 299 (1994). Our careful review of this authority reveals the narrow approval granted to sheriffs to enforce the law.

In *Leet*, the Court considered "whether a deputy sheriff has authority in Pennsylvania to make a warrantless arrest for motor vehicle violations committed in his presence." *Leet*, 537 Pa. at 91, 641 A.2d at 300. Concluding the power to enforce the Vehicle Code was rooted in common law, and was not abrogated by statute or otherwise, the Court held the deputy sheriff had authority. After an extensive discussion of the broad law enforcement power of sheriffs at common law, the Court stated:

> Though it may be unnecessary to cite additional authority, Blackstone confirms the common law power of the sheriff to make arrests without warrant for felonies and for breaches of the peace *committed in his presence*. Indeed, such powers are so widely known and so universally recognized that it is hardly necessary to cite authority for the proposition. To make the point, how few children would question that the infamous Sheriff of Nottingham had at least the authority to arrest Robin Hood.

*Id.* at 95, 641 A.2d at 303 (emphasis added) (citation omitted). Significantly, the Court narrowly tailored its holding to the facts presented, stating:

> Unless the sheriff's common law power to make warrantless arrests *for breaches of the peace committed in his presence* has been abrogated, *it is clear that a sheriff (and his deputies) may make arrests for motor vehicle violations which amount to breaches of the peace committed in their presence.*

*Id.* at 93, 641 A.2d at 301 (emphasis added). The Court also expected sheriffs en-

---

**6.** Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. § 7101–10004.

**7.** Act of April 14, 1972, P.L. 233, *as amended*, 35 P.S. §§ 780–101—780–144.

**8.** Act of November 24, 1998, P.L. 874, *as amended*, 18 P.S. §§ 1.1–1.8.

**9.** 75 Pa.C.S. §§ 101–9805.

forcing the Vehicle Code to undergo the same training required of police officers.

In light of *Leet's* training requirement, the Court in *Kline* was asked whether a deputy sheriff, who completed the deputy sheriff's basic training course, the driving while under the influence modules given to municipal police officers under Act 120, and training in field sobriety testing, qualified as a "police officer" for purposes of enforcing the Vehicle Code. The Court held, because the deputy completed the type of training contemplated by *Leet,* he was authorized to enforce the Vehicle Code and request a blood alcohol test. The Court concluded training other than Act 120 certification could suffice so as to permit Vehicle Code enforcement under *Leet.*

More recently, in *Lockridge,* our Supreme Court considered whether a deputy sheriff could file a citation against a motorist for driving with a suspended license when the deputy did not witness the offense. The Court concluded *Leet* was inapplicable as the issue was governed by the Pennsylvania Rules of Criminal Procedure. Because the Rules of Criminal Procedure authorized a sheriff to file a citation for a summary offense based on information received from a witness, the Court approved the deputy sheriff's action.[10]

Taken together, *Leet, Kline* and *Lockridge* only approve two narrow law enforcement functions. Thus, although the Court in *Leet* recognized a sheriff's broad authority at common law, it only sanctioned his authority to effectuate a warrantless arrest for a Vehicle Code violation that amounted to a breach of the peace committed in the deputy's presence. Neither *Kline* nor *Lockridge* expanded a

sheriff's authority to effectuate warrantless arrests for offenses committed in their presence. Indeed, the only additional law enforcement function approved in *Kline* was an activity expressly sanctioned by the Rules of Criminal Procedure. The Court did not approve a sheriff's power to investigate or make arrests for offenses committed outside their presence. Nor did the Court explicitly acknowledge a sheriff's law enforcement authority for the serious predicate offenses listed in the Wiretap Act.

Following the holdings in *Leet, Kline* and *Lockridge,* our Superior Court further delineated the law enforcement powers of sheriffs in *Commonwealth v. Bennett,* 827 A.2d 469 (Pa.Super.2003). There, deputy sheriffs accompanied members of the Bureau of Liquor Control Enforcement (LCE) on a routine bar inspection. Outside the bar, the deputy stopped a patron out of a concern he engaged in underage drinking and was in violation of an open container ordinance. An altercation ensued, after which the deputy arrested the patron and conducted a search, which yielded contraband. The trial court declined to suppress the evidence seized. On appeal, the Superior Court was asked whether the deputy had authority to make the arrest as he was not a member of the LCE and lacked authority to enforce the Liquor Code.[11] Addressing the law enforcement activities approved by our Supreme Court, the Court noted:

Sheriffs in Pennsylvania have statutory and non-statutory sources of authority. Sheriffs are charged with serving process and executing orders directed to the officer pursuant to law. 42 Pa.

---

10. Notably, the Rules of Criminal Procedure define the term "law enforcement officer" as "any person who is acting by law given the power to enforce the law when acting within the scope of that person's employment." Pa. R.Crim.P. 103.

11. Act of April 12, 1951, P.L. 90, *as amended,* 47 P.S. §§ 1–101—10-1001.

C.S.A. § 2921. Such statutory authority includes the sheriff's traditional, common law function of upholding the peace and enforcing the laws of the Commonwealth. [*Leet.*] Moreover, sheriffs have the authority to make warrantless arrests for breaches of the peace occurring in their presence, provided that they have proper training. [*Kline; Leet.*] ...

*Bennett,* 827 A.2d at 476. Agreeing the deputy lacked authority to conduct a warrantless inspection of the bar pursuant to the Liquor Code, the Court stated:

A review of the record reveals that [the deputy] is not a member of the LCE. Moreover, he did not have any specific written authorization to participate in the LCE inspection. Thus, we agree that [the deputy] was not authorized to act pursuant to the statute.

*Id.* Nevertheless, the court held, pursuant to the deputy's common law power to uphold the law, he could arrest for the offense which amounted to a breach of the peace committed in his presence.

Unlike the offenses at issue in the trilogy of cases decided by our Supreme Court or the offenses in *Bennett,* the Act's predicate offenses involve neither breaches of the peace for which sight arrests may be made nor summary offenses for which citations may issue. Because these cases do not permit sheriffs to make arrests or conduct investigations into the Act's serious predicate offenses, they do not support a sheriff's power to enforce the Wiretap Act.

## II. Wiretapping

Sheriffs assert their broad common law authority empowers them to conduct wiretap investigations. However, wiretapping was unknown at common law, and the authority to conduct wiretap investigations is purely statutory. An historical discussion highlights this distinction.

Explaining the common law origins of eavesdropping and tracing its technological developments through the mid-twentieth century, the United States Supreme Court noted:

Eavesdropping is an ancient practice which at common law was condemned as a nuisance. At one time the eavesdropper listened by naked ear under the eaves of houses or their windows, or beyond their walls seeking out private discourse. The awkwardness and undignified manner of this method as well as its susceptibility to abuse was immediately recognized. Electricity, however, provided a better vehicle and with the advent of the telegraph surreptitious interception of messages began. As early as 1862 California found it necessary to prohibit the practice by statute. During the Civil War General J.E.B. Stuart is reputed to have had his own eavesdropper along with him in the field whose job it was to intercept military communications of the opposing forces. Subsequently newspapers reportedly raided one another's news gathering lines to save energy, time, and money. Racing news was likewise intercepted and flashed to bettors before the official result arrived.

The telephone brought on a new and more modern eavesdropper known as the 'wiretapper.' Interception was made by a connection with a telephone line. This activity has been with us for three-quarters of a century. Like its cousins, wiretapping proved to be a commercial as well as a police technique. Illinois outlawed it in 1895 and in 1905 California extended its telegraph interception prohibition to the telephone.

Some 50 years ago a New York legislative committee found that police, in cooperation with the telephone company, had been tapping telephone lines in New

York despite an Act passed in 1895 prohibiting it. During prohibition days wiretaps were the principal source of information relied upon by the police as the basis for prosecutions. In 1934 the Congress outlawed the interception without authorization, and the divulging or publishing of the contents of wiretaps by passing s 605 of the Communications Act of 1934. New York, in 1938, declared by constitutional amendment that '(t)he right of the people to be secured against unreasonable interception of telephone and telegraph communications shall not be violated,' but permitted by ex parte order of the Supreme Court of the State the interception of communications on a showing of 'reasonable ground to believe that evidence of crime' might be obtained. . . .

As science developed these detection techniques, law makers, sensing the resulting invasion of individual privacy, have provided some statutory protection for the public. . . .

*Berger v. State of New York,* 388 U.S. 41, 45–47, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) (citations and footnotes omitted).

Unlike the eavesdropper at common law, the modern eavesdropper is aided by sophisticated electronic devices that facilitate eavesdropping in almost any situation. Ralph S. Spritzer, *Electronic Surveillance By Leave of the Magistrate: The Case in Opposition,* 118 U. Pa. L.Rev. 169 (1969). Describing the distinctions between physical searches and wiretaps, Professor Ralph Spritzer wrote:

The conventional search is limited to a designated thing in being—one of a finite number of things to be found in the place where the search is to be conducted, and ordinarily discoverable in a single brief visit. On the other hand, electronic surveillance is a quest for something which may happen in the future. Its effectiveness normally depends upon a protracted period of lying-in-wait. For however long that may be, the lives and thoughts of many people—not merely the immediate target but all who chance to wander into the web—are exposed to an unknown and undiscriminating intruder. Such a search has no channel and is certain to be far more pervasive and intrusive than a properly conducted search for a specific, tangible object at a defined location.

*Id.* at 189. These observations emphasize the differences between traditional investigations into a suspect's area of privacy and wiretap investigations. Similarly,

electronic surveillance is almost inherently indiscriminate. Interception of a telephone line provides to law enforcement all of the target's communications, whether they are relevant to the investigation or not, raising concerns about compliance with the particularity requirement in the Fourth Amendment and posing the risk of general searches. In addition, electronic surveillance involves an on-going intrusion in a protected sphere, unlike the traditional search warrant, which authorizes only one intrusion, not a series of searches or a continuous surveillance. Officers must execute a traditional search warrant with dispatch, not over a prolonged period of time. If they do not find what they were looking for in a home or office, they must leave promptly and obtain a separate order if they wish to return to search again. Electronic surveillance, in contrast, continues around-the-clock for days or months. Finally, the usefulness of electronic surveillance depends on lack of notice to the suspect. In the execution of the traditional search warrant, an announcement of authority and purpose ("knock and notice") is con-

sidered essential so that the person whose privacy is being invaded can observe any violation in the scope or conduct of the search and immediately seek a judicial order to halt or remedy any violations. In contrast, wiretapping is conducted surreptitiously.

James X. Dempsey, *Communications Privacy in the Digital Age: Revitalizing the Federal Wiretap Laws to Enhance Privacy*, 8 Alb. L.J. Sci. & Tech. 65, 69–70 (1997) (footnotes and quotation omitted).

Beginning in 1928, the United States Supreme Court considered the constitutionality of the use of wiretaps by law enforcement officers. Landmark decisions in the area of wiretapping articulate the rationale for the enactment of statutes authorizing wiretap investigations.

In *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), the United States Supreme Court first addressed the constitutionality of wiretaps. There, the Court was asked whether the use of evidence of private telephone conversations intercepted by means of wiretapping violated the Fourth Amendment. The Court determined the Fourth Amendment was intended to limit trespass on property as that was the common law origin of the amendment. The Court concluded wiretapping did not amount to a search or seizure within the meaning of the Fourth Amendment.

In a famous dissent describing the new dangers posed by wiretapping, Justice Brandeis opined:

When the Fourth and Fifth Amendments were adopted, 'the form that evil had theretofore taken' had been necessarily simple. Force and violence were then the only means known to man by which a government could directly effect self-incrimination. It could compel the individual to testify-a compulsion effected, if need be, by torture. It could

secure possession of his papers and other articles incident to his private life-a seizure effected, if need be, by breaking and entry.... But 'time works changes, brings into existence new conditions and purposes.' Subtler and more far-reaching means of invading privacy have become available to the government. Discovery and invention have made it possible for the government, by means far more effective than stretching upon the rack, to obtain disclosure in court of what is whispered in the closet....

The progress of science in furnishing the government with means of espionage is not likely to stop with wire tapping. Ways may some day be developed by which the government, without removing papers from secret drawers, can reproduce them in court, and by which it will be enabled to expose to a jury the most intimate occurrences of the home....

*Id.* at 473–74, 48 S.Ct. 564.

Nearly 40 years later, in *Berger*, the United States Court considered the constitutionality of New York's permissive eavesdrop statute. The Court concluded the statute was unconstitutional on its face because it did not require a showing of probable cause before an order authorizing eavesdropping would issue. In addition, the statute did not require specification of the crime committed or of the particular conversation sought. Because the law did not require an indication of the particular crime under investigation, the place to be searched, or the "things" to be seized, the Court held it violated the Fourth Amendment. The Court noted the inherent obtrusiveness of eavesdropping made the need for particularity "especially great." *Berger*, 388 U.S. at 56, 87 S.Ct. 1873.

Later that year, in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19

L.Ed.2d 576 (1967), the Court overruled *Olmstead*, espousing the rationale expressed by Justice Brandeis' dissent. In *Katz*, federal agents tapped a public telephone booth from which a suspect made his calls. The Court was again called upon to consider the validity of a wiretap. Holding the Fourth Amendment "protects people, not places," the Court stated:

> What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

*Id.* at 351–52, 88 S.Ct. 507. Because Katz sought to exclude the "uninvited ear" by closing the door to a public telephone booth, "he was entitled to assume the words he utters into the mouthpiece [would] not be broadcast to the world." *Id.* at 352, 88 S.Ct. 507.

Congress viewed *Berger* and *Katz* as a threat to the use of wiretaps in investigations. *See* Larry Downes *Electronic Communications and the Plain View Exception: More "Bad Physics"*, 7 Harv. J.L. & Tech. 239 (1994). In response, Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968.[12] *See* Charles H. Kennedy & Peter P. Swire, *State Wiretaps and Electronic Surveillance After September 11*, 54 Hastings. L.J. 971, 976 (2003). Title III regulates the electronic and mechanical interception of wire, oral and electronic communica-

tions by government officials and private citizens. *Id.*

In 1986, Congress updated the requirements by means of the Electronic Communications Privacy Act (ECPA), which addressed newer communications technologies. *Id.* The ECPA broadly prohibits interceptions of wire, oral and electronic communications, except where the communications comply with specific statutory requirements. *Id.* Where interceptions will be conducted by law enforcement officers,[13] the ECPA identifies the officials who may apply for an order, the predicate offenses, the probable cause showing an applicant must make, and the "findings" and "minimization" requirements the order must contain. Under the Fourth Amendment and the ECPA, states that wish to perform wiretaps must enact statutes that closely track the federal law requirements. *Id.*

Pennsylvania's Wiretap Act[14] is generally modeled after the federal analogue. *See Commonwealth v. Spangler*, 570 Pa. 226, 809 A.2d 234 (2002). This statute is the basis upon which law enforcement officers may use wiretaps as a means of investigation. The Pennsylvania Supreme Court characterized the Act as:

> [A] statutory scheme which permits governmental intrusion, via sophisticated surveillance techniques, into the homes of the citizens of this Commonwealth. As this Court noted in *Com-*

---

**12.** 18 U.S.C. §§ 2510–2520.

**13.** Unlike sheriffs in Pennsylvania, United States Marshals are empowered by statute to make warrantless arrests for any offense against the United States or for any felony that is cognizable under the laws of the United States. *See* 28 U.S.C. § 566(d); *Huguenin v. Ponte*, 29 F.Supp.2d 57, 65 at n. 16 (D.R.I. 1998). In addition, United States Marshals are empowered to exercise the same powers of

sheriffs in Pennsylvania. *See* 28 U.S.C. § 564. Thus, United States Marshals are empowered to arrest for: (i) any offense against the United States or for any felony cognizable under the laws of the United States; *and* (ii) any breach of the peace committed in their presence.

**14.** Regulations attendant to the Wiretap Act are found at 37 Pa.Code §§ 51.1–51.15.

*monwealth v. Blystone,* 519 Pa. 450, 462, 549 A.2d 81, 86 (1988) 'the current electronic surveillance statute strikes a balance between citizens' legitimate expectation of privacy and the needs of law enforcement officials to combat crime. In this regard the General Assembly has provided safeguards to protect the liberties of the citizens of the Commonwealth.' The Wiretap Act does contain strict guidelines as to how and when electronic surveillance methods shall be permitted....

*Boettger,* 534 Pa. at 585–86, 633 A.2d at 1148 (1993).

Under the Wiretap Act, only investigative or law enforcement officers may be trained in wiretapping and electronic surveillance. 18 Pa.C.S. §§ 5704, 5724. The term "investigative or law enforcement officers," as contemplated in the Act, is limited to those officers empowered to conduct investigations of or make arrests for the Act's predicate offenses. 18 Pa.C.S. § 5702.

 Notably, prior to issuing a surveillance order, a court must determine that "normal investigative procedures ... failed." 18 Pa.C.S. § 5710(a)(3); *Doty.* This provision is "designed to guarantee that wiretapping will not be resorted to in situations where traditional investigative techniques are adequate to expose the crime...." *Doty,* 498 A.2d at 880. Sheriffs' common law authority to arrest for offenses committed in their presence is the type of traditional law enforcement which must be inadequate before a wiretap is authorized. Additionally, wiretapping does not involve offenses for which a sight arrest may be effectuated, such as Vehicle Code violations. For these reasons, sheriffs' common law authority to make warrantless arrests for offenses committed in

their presence is no source of authority to enforce the Wiretap Act.

In summary, wiretaps afford authorities a penetrating and persistent investigative tool unknown at common law. Because of the potential for unconstitutional privacy violations, wiretaps are strictly regulated by statute, and authority to pursue wiretaps arises solely from the regulating statute. The statutory nature of wiretap authority dispels sheriffs' assertion that they are empowered to utilize wiretaps by virtue of their common law authority. Moreover, the Wiretap Act confers a limited right to use wiretaps upon law enforcement officers empowered to investigate or arrest for the Wiretap Act's enumerated offenses. As discussed, sheriffs lack the power to investigate or make arrests for the Wiretap Act's serious predicate offenses. Consequently, they are not "investigative or law enforcement officers" within the meaning of the Wiretap Act.

### III. Role of Modern Sheriffs in Pennsylvania

Our conclusion is consistent with other authority addressing the role of modern sheriffs in Pennsylvania. Despite Sheriffs' contentions that they enjoy broad powers at common law, modern sheriffs are primarily charged with court-related functions.

In Pennsylvania, the office of sheriff is a constitutional one: "[c]ounty officers shall consist of ... sheriffs...." Pa. Const. art. IX, § 4. Although our state Constitution recognizes the sheriff's office, it does not define its powers.

There are only two statutory provisions which specifically reference the modern sheriff's duties. First, sheriffs and deputy sheriffs are required to perform all those duties authorized or imposed on them by

statute. 13 P.S. § 40.[15] Second, under the Judicial Code, "[t]he sheriff, either personally or by deputy, shall serve process and execute orders directed to him pursuant to law." 42 Pa.C.S. § 2921. Thus, the only statutes expressing a sheriff's duties address court-related functions.

In addition, beginning with *Venneri v. County of Allegheny*, 12 Pa.Cmwlth. 517, 316 A.2d 120 (1974), this Court addressed the role of modern sheriffs as court-related personnel, albeit in the labor relations context. In *Venneri*, we were asked whether deputy sheriffs were "policemen" for collective bargaining purposes under Act 111.[16] Concluding they were not, we determined, although their duties encompassed many activities normally performed by police, their primary duties were directly related to the operation of the courts. We stated, "[e]ven a cursory legislative review leaves no doubt that the bulk of legislation dealing with the sheriff pertains to court related activities." *Id.* at 126.

Twelve years later in *Allegheny County Deputy Sheriff's Ass'n v. Pennsylvania Labor Relations Bd.*, 95 Pa.Cmwlth. 132, 504 A.2d 437 (1986), we reaffirmed *Venneri*, concluding no substantial change occurred in the duties of deputy sheriffs since our decision. Thus, we reiterated our conclusion that, although they perform some police-type functions, "the deputy sheriffs have maintained their traditional status as an arm of the ... judicial system, implementing various court-related processes." *Id.* at 439.

More recently, in *Cambria County Sheriff's Ass'n v. Pennsylvania Labor Relations Bd.*, 799 A.2d 957 (Pa.Cmwlth.2002), we were asked to reconsider whether deputy sheriffs were police officers under Act 111 in light of *Leet* and *Kline*. We determined, although the Court in *Leet* and *Kline* recognized the common law authority of deputy sheriffs to make arrests, it did not discover any legislative authority empowering them to act as police officers. In the absence of additional statutory authorization permitting deputy sheriffs to act as police officers since *Venneri* and *Allegheny County Deputy Sheriff's Ass'n*, we reaffirmed that deputy sheriffs are not police for collective bargaining purposes.

As recognized in *Cambria County Sheriff's Ass'n*, *Allegheny County Deputy Sheriff's Ass'n* and *Venneri*, a sheriff's principal function is as an arm of the court. This is the only duty specifically assigned to the office of sheriff by the Legislature.

Judicial respect for the important professional work of sheriffs is profound. This respect, however, cannot supply a legal basis for sheriffs to enforce the Wiretap Act which does not otherwise exist. Based on the foregoing, the Commissioner's motion for summary relief is granted, and the Sheriffs' motion for summary relief is denied.

### ORDER

AND NOW, this 20th day of February, 2004, the application for summary relief filed by Respondent Jeffrey B. Miller, Commissioner of the Pennsylvania State Police, is GRANTED. The application for summary relief filed by Petitioners is DENIED.

---

15. Act of June 29, 1976, P.L. 475, *as amended*, 13 P.S. § 40.

16. Act 111, which is the Act of June 24, 1968, P.L. 237, *as amended*, 43 P.S. §§ 217.1– 217.10, governs collective bargaining between policemen and firemen and their public employers.