**DRB, INC. d/b/a Superior Homes;
and Bonnie Heights Homes,
Petitioners**

v.

**PENNSYLVANIA DEPARTMENT OF
LABOR AND INDUSTRY,
Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 5, 2004.

Decided June 24, 2004.

---

Lawrence R. Weider, Harrisburg, for petitioner.

James A. Holzman, Harrisburg, for respondent.

BEFORE: COLINS, President Judge, and LEADBETTER, Judge, and JIULIANTE, Senior Judge.

OPINION BY Judge LEADBETTER.

Petitioners, DRB, Inc. and Bonnie Heights Homes, two Pennsylvania corporations that retail manufactured and industrialized housing, have filed a petition for review in this court's original jurisdic-

tion seeking a declaratory judgment that certain provisions of the recently promulgated Uniform Construction Code[1] are null and void as they pertain to manufactured and industrialized housing. Presently before the court for disposition are the Department of Labor and Industry's (Department) preliminary objections to the petition for review and petitioners' application for summary relief. The legal question that we must answer is whether the Department may properly regulate certain manufactured and industrialized housing activities in light of a statutory exemption for manufactured and industrialized housing in the Pennsylvania Construction Code Act,[2] the enabling legislation authorizing the Department to promulgate the Uniform Construction Code. After review, we grant the Department's preliminary objection in the nature of a demurrer and deny petitioners' application for summary relief.[3]

In 1999, the General Assembly enacted the Construction Code Act (CCA) to establish uniform and modern construction standards throughout the Commonwealth that would, *inter alia:* (1) provide standards "for the protection of life, health, property and environment and for the safety and welfare of the consumer, general public, and the owners and occupants of buildings and structures;" (2) encourage standardization and economy in construction; (3) encourage use of state-of-the-art technology, devices and improvements; (4) eliminate existing codes to the extent that such codes are restrictive, obsolete, conflicting and contain duplicative construction regulations; and (5) eliminate unnecessary duplication of effort and fees relating to the review of construction plans and the inspection of construction projects. *See* Section 102 of the CCA, 35 P.S. § 7210.102. The CCA specifically applies to the "construction, alteration, repair and occupancy of all buildings in the Commonwealth." Section 104 of the CCA, 35 P.S. § 7210.104. Pursuant to Section 901 of the CCA, "manufactured housing" and "industrialized housing" are exempt. 35 P.S. § 7210.901(a). Section 901 provides:

> This act shall not apply to manufactured housing which bears a label, as required by and referred to in the act ... known as the Manufactured Housing Construction and Safety Standards Authorization Act [Manufactured Housing Act], which certifies that it conforms to Federal construction and safety standards adopted under the Housing and Community Development Act of 1974 ... nor shall it apply to industrialized housing, as defined in the act ... known as the Industrialized Housing Act [footnotes omitted].

The Manufactured Housing Act[4] defines a "manufactured home" as:

> A structure, transportable in one or more sections, which in traveling mode, is eight body feet or more in width, or 40 body feet or more in length, or, when erected on site, is 320 or more square

1. Chapters 401, 403 and 405 of Title 34 of the Pennsylvania Code.

2. Act of November 10, 1999, P.L. 491, *as amended*, 35 P.S. §§ 7210.101—7210.1103.

3. In considering preliminary objections in the nature of a demurrer, we accept as true all well-pleaded facts and all inferences reasonably drawn therefrom. *Smith v. Dep't of Corrections*, 837 A.2d 652, 654 (Pa.Cmwlth.2003).

Summary relief is appropriate when it is clear from the undisputed facts that a party has a clear right to the relief requested. Pa. R.A.P. 1532(b). When the question presented is one of law and no facts are in dispute, summary relief may be granted. *Kopko v. Miller*, 842 A.2d 1028, 1030 n. 4. (Pa.Cmwlth.2004).

4. The Act of November 17, 1982, P.L. 676, as amended, 35 P.S. §§ 1656.1—1656.9.

feet and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities and includes the plumbing, heating, air conditioning and electrical systems contained therein. The term shall include any structure which meets all the requirements of this paragraph except the size requirements and with respect to which the manufacturer voluntarily files a certification required by the United States Department of Housing and Urban Development [HUD] and complies with the standards established under this act.[5]

Section 2 of the Manufactured Housing Act, 35 P.S. § 1656.2 (footnote added). The Industrialized Housing Act[6] defines "industrialized housing" as:

[A]ny structure designed primarily for residential occupancy which is wholly or in substantial part made, fabricated, formed or assembled in manufacturing facilities for installation, or assembly and installation, on the building site; however, for the purposes of this act, that category of housing units defined as mobile homes is excluded from this definition.

Section 3 of the Industrialized Housing Act, 35 P.S. § 1651.3.

Pursuant to the CCA, the Department promulgated the Uniform Construction Code (Code). In establishing the Code, the Department adopted and incorporated by reference various model codes, including the International Residential Code. *See* 34 Pa.Code § 403.21. The Code applies to the "construction, alteration, repair, movement, equipment, removal, demolition, location, maintenance, occupancy or change of occupancy of every building or structure which occurs after April 9, 2004." 34 Pa. Code § 403.1(a). However, like the CCA, the Code contains an exclusion for manufactured and industrialized housing. Section 403.1(b)(5) provides that the Code does not apply to "[m]anufactured or industrialized housing *shipped from the factory* under section 901(a) of the Act [35 P.S. § 7210.901(a)] as provided in § 403.25 (relating to manufactured and industrialized housing)" 34 Pa.Code § 403.1(b)(5) (emphasis added).

Section 403.25 of the Code, a provision central to the instant dispute, provides:

(a) Manufactured housing is governed by the following under section 901(a) of the Act (35 P.S. § 7210.901(a)):

(1) Except as provided in paragraph (2), the [Code] does not apply to manufactured housing *assembled by and shipped from the manufacturer and which bears a label* which certifies that it conforms to Federal construction and safety standards adopted under the Housing and Community Development Act of 1974 (42 U.S.C.A. §§ 5401—5426).

(2) This chapter and sections AE501–AE503 and AE601—AE605 of Appendix E [7] If the International Residential

---

5. The Manufactured Housing Act requires all manufactured homes sold in the Commonwealth to meet the manufactured home construction and safety standards adopted by the U.S. Department of Housing and Urban Development pursuant to the National Manufactured Home Construction and Safety Standards Act of 1974 as well as any additional standards imposed by the Department. Section 3 of the Manufactured Housing Act, 35 P.S. § 1656.3.

6. The Act of May 11, 1972, P.L. 286, *as amended,* 35 P.S. §§ 1651.1—1651.12.

7. These sections address such areas as the foundation system, installation instructions, soil classification, foundation footings and drainage.

Code adopted under the [Code] apply to the following:

 (i) Site preparation.

 (ii) Foundation construction.

 (iii) Connection to utilities.

 (3) The [Code] applies to the following:

 (i) Alteration or repair to the unit that does not fall within 24 CFR 3280.1–3280.904 (relating to manufactured home construction safety standards) and the manufacturer's installation instructions after assembly and shipment by the manufacturer.

 (ii) Additions to the unit after delivery to the site.

 (iii) Construction, alteration, repair, or change of occupancy if the manufactured housing is resold to a subsequent purchaser.

 (iv) Construction, alteration, repair or change of occupancy if the original purchaser relocates the manufactured housing.

 (b) Industrialized housing is governed by the following under section 901(a) of the act:

 (1) Except as provided in subsection (b)(2), the [Code] does not apply to industrialized housing assembled by and shipped from the manufacturer.

 (2) The [Code] applies to all of the following:

 (i) Site preparation.

 (ii) Foundation construction.

 (iii) Utilities connection.

 (iv) Construction, alteration or repair to the industrialized housing unit after installation. . . .

34 Pa.Code § 403.25 (footnote and emphasis added).

In addition, with respect to permit requirements, Section 403.62(a) of the Code provides that an owner who "intends to construct, enlarge, alter, repair, move, demolish, or change the occupancy of a residential building . . . shall . . . obtain the required permit under § 403.62a (relating to permit application)." 34 Pa.Code § 403.62(a). A permit is not required, however, for the exceptions listed in Section 403.1(b) of the Code, which includes "manufactured or industrialized housing *shipped from the factory* under section 901(a) of the [A]ct. . . ." *Id.* at § 403.62(c)(emphasis added).

The Code regulations preempt construction standards of any existing statute, local ordinance or regulation promulgated or adopted by a board, department, commission, State agency or local government. Section 104 of the CCA, 35 P.S. § 7210.104(d)(1). *See also* Section 301 of the CCA, 35 P.S. § 7210.301(d)(1). Pursuant to the CCA, municipalities shall enact an ordinance adopting the Code as their municipal building code. Section 501 of the CCA, 35 P.S. § 7210.501. In municipalities that do not adopt an ordinance for the administration and enforcement of the Act, an applicant for a construction permit is required to obtain the services of a construction code official or third-party agency to conduct the required plan review and inspections. *Id.*

Petitioners contend in their petition for review and application for summary relief that Section 403.25 of the Code is void insofar as it seeks to govern manufactured and industrialized housing site preparation, foundation construction, connection to utilities (also referred to as placement activities) and other changes to the structure because: (1) the CCA clearly and specifically exempts manufactured and industrialized housing from its scope;[8] and (2) the

8. In support of this argument, petitioners cite Section 901 of the CCA.

CCA only authorizes adoption of regulations pertaining to construction, alteration and repair of buildings and, therefore, regulations pertaining to site preparation, foundation construction and utility connections are void.[9] According to petitioners, the CCA exempts manufactured and industrialized housing because they are already subject to federal regulation or State regulation under the Commonwealth's Manufactured and Industrialized Housing Acts.

Petitioners also challenge the validity of Appendix E, which they allege regulates manufactured home *installation.* According to petitioners, the CCA does not give the Department the authority to enact an appendix to the Code, nor does it give the Department the authority to regulate installation activities because they do not fall within the scope of construction, alteration, repair or occupancy. Finally, petitioners contend that the Department cannot apply the permitting requirements of Sections 403.62, 403.64 and 403.65 of the Code because a permit is required of one who intends to construct a residential building and manufactured or industrialized housing is installed, not constructed.[10]

In its preliminary objections, the Department demurs, contending that the CCA requires the Department to regulate construction and related activities and that the activities regulated by Section 403.25 of the Code, such as site preparation, foundation construction and utility connection, fall within the scope of construction.[11] The Department maintains that Section 901 only exempts from regulation the manufactured or industrialized housing *unit* that is constructed and shipped from the factory. According to the Department, manufactured or industrialized housing placement activities are not included within the exemption. The Department also argues that there is no merit to petitioners' contentions that it lacks the authority to adopt an appendix as part of the Code or that manufactured and industrialized housing are not subject to permit requirements because those housing types are installed rather than constructed.

▇▇▇ Preliminarily, we note the factors that must be present in order for the court

---

9. Petitioners rely on Section 301(d) of the CCA, entitled "Scope of regulations," to support this argument. Section 301(d) provides that "[t]he regulations adopted by the department implementing these codes shall supersede and preempt all local building codes regulating any aspect of the construction, alteration and repair of buildings...." 35 P.S. § 7210.301(d).

10. Petitioners also contend that they lack an adequate remedy and will suffer immediate hardship without a declaratory judgment because: (1) the regulations are ambiguous in that they seemingly apply to manufactured and industrialized housing despite language in the CCA affording an exemption; (2) the Code impermissibly imposes additional burdens on petitioners when the Act specifically exempted petitioners from its application; (3) petitioners are confused regarding the appropriate standards to follow—the federal standards, the standards established in the Manu-

factured and Industrialized Housing Acts or the standards of the CCA; (4) petitioners cannot accurately advise buyers of the applicable standards, thereby placing petitioners at risk of penalties for violations of the CCA and Code; and (5) petitioners' confusion regarding applicable standards will ultimately lead to economic hardship.

11. The Department also asserts in its preliminary objections that: (1) a declaratory judgment is inappropriate because petitioners have only alleged a disagreement with the Code rather than the requisite actual case or controversy presenting imminent/inevitable litigation; (2) judicial resolution of Code issues for particular buildings requires creation of a fact-record, which will differ for each manufactured or industrialized housing activity; (3) the matter is not ripe for review; and (4) the petition for review is vague and hampers the Department's ability to prepare a defense.

to render declaratory relief. Generally, declaratory relief is not available unless an actual controversy exists that is imminent or inevitable. *Silo v. Ridge*, 728 A.2d 394 (Pa.Cmwlth.1999). "A declaratory judgment is not appropriate to determine rights in anticipation of events which may never occur but is appropriate where there is imminent and inevitable litigation." *Id.* at 398. With respect to a petition for declaratory judgment seeking pre-enforcement review of an administrative agency's regulations, this court stated in *Pennsylvania Dental Hygienists' Association, Inc. v. State Board of Dentistry*, 672 A.2d 414 (Pa.Cmwlth.1996):

> Generally, courts are reluctant to grant a declaratory judgment and injunctive remedies against administrative agencies, unless the controversy is ripe for judicial resolution. The rationale behind the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." [T]his court must refrain from exercising its original equitable jurisdiction to consider a pre-enforcement challenge to the validity of an administrative agency's regulations when there exists an adequate statutory remedy. A statutory review process of an agency following its application and enforcement of the regulations constitutes an adequate remedy for the purpose of determining the propriety of this Court's exercise of its original jurisdiction, if the effect of the challenged regulations upon the industry regulated is not direct and immediate.

672 A.2d at 416–17 (citations omitted).

In *Arsenal Coal Co. v. Department of Environmental Resources*, 505 Pa. 198, 477 A.2d 1333 (1984), our Supreme Court held that a declaratory judgment in a pre-enforcement regulatory challenge was appropriate where the petitioners alleged they would suffer ongoing uncertainty in their day-to-day operations and would sustain substantial expense in complying with the challenged regulations while proceeding through the administrative process.

After a review of the petition for review and arguments of the parties, we conclude that declaratory disposition is appropriate. Petitioners have alleged harm similar to that asserted in *Arsenal Coal*, the issues raised are purely legal, an actual controversy is present, as the parties are clearly at odds regarding the validity and application of the challenged regulations, and municipalities must adopt, apply and enforce the Code regulations over the course of the next several months.

We also conclude that the challenged regulations are valid and that their application to manufactured and industrialized housing does not violate the exemption for such housing contained in the CCA. It is well-settled that an agency's interpretation of a statute is entitled to deference where the regulation tracks the meaning of the statute and does not violate legislative intent. *Commonwealth v. Gilmour Mfg. Co.*, 573 Pa. 143, 822 A.2d 676 (2003). *See also Caso v. Workers' Comp. Appeal Bd. (Sch. Distr. of Philadelphia)*, 576 Pa. 287, 291–92, 839 A.2d 219, 221 (2003) (stating that the "interpretation of a statute by those charged with its execution is entitled to great deference, and will not be overturned unless such construction is clearly erroneous.)" Here, the Department's interpretation that Section 901 of the CCA exempts from regulation only the manufactured or industrialized housing unit that is constructed at and shipped from the factory, leaving site

preparation, foundation construction and utility connections subject to regulation under the CCA, is reasonable; the Department's interpretation is consistent with both the regulatory scheme existing before enactment of the CCA and the CCA as well.

The Section 901 exemption refers to manufactured housing that *"bears a label as required by [the Commonwealth's Manufactured Housing Act], which certifies that it conforms to Federal construction and safety standards . . . ."* 35 P.S. § 7210.901 (emphasis added). We begin our analysis of the regulatory scheme with an examination of the federal act, the National Manufactured Housing Construction and Safety Standards Act of 1974 (federal act), 42 U.S.C. §§ 5401—5427,[12] and the accompanying regulations. Initially, we note that the federal Act defines a "manufactured home" in the same manner as the Commonwealth's Manufactured Housing Act. *See* 42 U.S.C. § 5402. "[F]ederal manufactured home construction and safety standard[s]" are defined by the federal act as standards for the "construction, design, and performance of a manufactured home which meets the needs of the public including the need for quality, durability, and safety." 42 U.S.C. § 5402. "Installation standards," which are defined separately by the federal act, are "reasonable specifications for the installation of a manufactured home, at the place of occupancy, to ensure proper siting, the joining of all sections of the home, and the installation of stabilization, support, or anchoring systems." *Id.* Pursuant to the federal act, the Secretary of Housing and Urban Development established manufactured home construction and safety standards, which are set forth in Title 24, Part 3280 of the Code

of Federal Regulations. Those regulations govern "all equipment and installations in the design, construction, transportation, fire safety, plumbing, heat-producing and electrical systems" of manufactured homes. 24 C.F.R. § 3280.1. Once a federal construction and safety standard is established, it preempts State standards regulating the same aspect of a manufactured home. Importantly, the federal Act specifically reserves to each State the right to establish standards for the stabilizing and support systems and foundations on which manufactured homes are sited.[13] 42 U.S.C. § 5403(d).

Pursuant to the federal act, a certification label must be affixed by the manufacturer prior to delivery of the home to the distributor or retailer, certifying that the home conforms to all applicable federal construction and safety standards. Thus, the certification label signifies that the home, prior to installation at the home site, conforms to federal manufacturing requirements. Obviously, the certification label does not pertain to installation of the home, site preparation, foundation construction or utility connection because the label is affixed prior to delivery to the retailer or distributor.

Pursuant to the Commonwealth's Manufactured Housing Act, all manufactured homes sold in Pennsylvania must comply with federal standards. Section 3 of the Manufactured Housing Act, 35 P.S. § 1656.3. A manufactured home that bears the requisite certification label is deemed to comply with all ordinances, regulations or building codes enacted by a municipality except for utility connections to their main source. Section 4, 35 P.S. § 1656.4. *See*

12. The federal Act was amended in 2000 by the Manufactured Housing Improvement Act of 2000, Pub.L. 106–569.

13. In establishing its own standards, each State must comply with 42 U.S.C. § 5404 (manufactured home installation standards).

*also* 12 Pa.Code § 143.5 (providing that except for utility connections to main source of supply, manufactured home bearing requisite certification label is deemed to comply with all local municipal requirements applicable to body and frame design and construction and installation of plumbing, heating and electrical systems within and including the exterior walls of the manufactured home.). Notably, the regulations do not provide that a manufactured home bearing the requisite label is deemed to comply with all local regulations applicable to site preparation and foundation construction.

Similarly, pursuant to the Industrialized Housing Act, no industrialized housing may be sold, leased or installed for use in the Commonwealth unless it bears insignia of certification demonstrating that it conforms to the rules and regulations of the Department. Section 4 of the Industrialized Housing Act, 35 P.S. § 1651.4(a). An industrialized home that bears the requisite insignia is deemed to comply with the requirements of all municipal building codes and ordinances applicable to "housing and/or home building in construction, plumbing, heating, electrical, and other related codes pertaining to such construction, and equipment contained within and including the exterior walls of such industrialized housing" except for utility connections to the main supply source. *Id.,* 35 P.S. § 1651.4(e). *See also* 12 Pa.Code § 145.36. The regulations promulgated pursuant to the Industrialized Housing Act govern the design, manufacture, storage, transportation and installation of industrialized housing and housing components. 12 Pa.Code § 145.3. Pursuant to the industrialized housing regulations, local agencies are responsible for enforcing locally enacted codes and ordinances governing site preparation work and utility connections. 12 Pa.Code § 145.81(a). Under the Industrialized Housing Act, local agencies may

require both building permits and certificates of occupancy. 12 Pa.Code §§ 145.82, 145.83.

The above-referenced statutory and regulatory schemes, which require that a manufactured or industrialized home bear a label of certification that the home complies with State and/or federal standards in order to be sold, that the homes are affixed with the labels prior to sale and prior to placement activities on the home site and that the presence of such label is deemed to satisfy the requirements of all local building requirements, support the Department's interpretation that the exemption in the CCA for manufactured and industrialized homes refers only to the unit itself which bears the certification label and which is shipped from the manufacturer, and does not encompass activities that occur after the sale to install the home at the home site. The statutory definitions of manufactured home and industrialized home also support the Department's interpretation as both definitions describe only the movable structure before it has been secured or installed at the building site. We especially note that the definition of a manufactured home in the Manufactured Home Act expressly states that the structure defined as a manufactured home includes the plumbing, heating, air conditioning and electrical systems contained therein; the structure as defined does not encompass post sale activities such as the construction of a foundation.

The Department's interpretation is reasonable because the construction of a manufactured home is subject to detailed, comprehensive federal construction and safety standards that preempt any State or local standards that are not identical. Similarly, the regulations governing industrialized housing have incorporated model codes such as the BOCA National Building Code

and the International Code Council (ICC) International Mechanical Code and Plumbing Code to establish standards for the design and manufacture of industrialized homes. Both the Manufactured and Industrialized Housing Acts provide that the home's compliance with the applicable standards satisfies local municipal standards addressing the same areas of concern. Thus, before the CCA was enacted, these two types of homes were already being manufactured under a uniform, comprehensive set of federal or State standards. Accordingly, it is logical that the manufacture of such homes is exempted from the CCA, the purpose of which is to, among other things, encourage standardization in construction and use of state-of-the-art technology and improvements as well as elimination of conflicting codes and standards.

Further, placement activities such as site preparation, foundation construction and utility connection, are generally subject to local regulation rather than regulation under the federal act or the Manufactured or Industrialized Housing Acts. Indeed, petitioners aver in their petition for review that "[s]ome municipalities regulate the site preparation, foundation construction and connection to utilities . . . others do not." Petition for review, para. 52. This is borne out by our review of the relevant federal and State statutes.

First, the federal act and accompanying regulations do not contain any significant provisions governing site preparation, foundation construction or utility connections. As we already noted, 42 U.S.C. § 5403(d) provides that the States retain the right to establish standards for the stabilizing and support systems of manufactured homes as well as foundations. Further, although petitioners contend that several of the federal regulations address manufactured home installation and utility connections, namely 24 C.F.R. §§ 3280.306, entitled, "Windstorm protection,"[14] and 3280.803, entitled "Power supply,"[15] these regulations do not appear to be comprehensive or to conflict with the Code.[16] Moreover, notwithstanding the fact that petitioners have not identified any specific conflict between the federal and State standards, the potential for a conflict does not prevent the conclusion that manufactured and industrialized housing placement activities are subject to regulation under the CCA.

Second, neither the Manufactured Housing Act nor the Industrialized Housing Act appear to contain any significant or comprehensive standards for placement activities. Both Acts specifically leave utility connections to local regulation and the regulations promulgated under the Industrialized Housing Act leave site preparation work to local regulation. To the extent that either Act's regulations might govern some placement activities,[17] such would be

14. Section 3280.306 requires that manufacturers of manufactured homes provide installation instructions that provide for support and anchoring systems that will resist overturning and sliding of the home. These instructions must address the location and required capacity of stabilizing devices, means of transferring wind loads to anchoring or foundation systems, and installation of and requirements for anchors and ties.

15. Section 3280.803 sets forth requirements for the power supply to the manufactured home.

16. To the extent that the Code would conflict with any federal standard, then the Code regulation would give way and be preempted by the federal regulation.

17. Our review of the Manufactured Housing Act and accompanying regulations did not reveal any provisions governing placement activities. As to the Industrialized Housing

preempted by the CCA, which expressly states that:

Except as otherwise provided in this act, construction standards provided by any statute or local ordinance or regulation promulgated or adopted by a board, department, commission, agency of State government or agency of local government shall continue in effect only until the effective date of regulations promulgated under this act, at which time they shall be preempted by regulations promulgated under this act and deemed thereafter to be rescinded.

Section 104 of the CCA, 35 P.S. § 7210.104. Thus, the fact that placement activities were primarily subject to local regulation prior to the CCA further supports the conclusion that the exemption for manufactured and industrialized housing in the CCA refers only to the factory constructed structure and not the post-sale activities necessary to install the home at the home site. It is logical for the Code to include these activities in its provisions because it is replacing individual local municipal codes and regulations with statewide uniform standards. Accordingly, we accept the Department's interpretation of the Section 901 exemption because it tracks the language of the CCA, it is consistent with the articulated purposes of the CCA, and it is consistent with the statutory scheme governing manufactured and industrialized housing.

■ Next, petitioners take issue with Appendix E of the International Residential Code, which the Department incorporated by reference into the Code. 34 Pa. Code § 403.21(a)(9). According to petitioners, Appendix E sets standards for the installation of manufactured homes. Petitioners contend that the CCA does not authorize the Department to adopt an appendix or regulate installation activities. We disagree.

■ In Commonwealth v. Beam, 567 Pa. 492, 788 A.2d 357 (2002), our Supreme Court described the source and limits of an administrative agency's authority:

This Court has long adhered to the precept that the power and authority exercised by administrative agencies must be conferred by legislative language that is clear and unmistakable. At the same time, we recognize that the General Assembly has prescribed that legislative enactments are generally to be construed in such a manner as to effect their objects and promote justice ... and, in assessing a statute, courts are directed to consider the consequences of a particular interpretation, as well as other factors enumerated in the Statutory Construction Act. See Butler County Mushroom Farm, 499 Pa. [509], 516–17, 454 A.2d [1], 5–6 [(1982)] (citing 1 Pa.C.S. § 1921(a)) (observing that "[s]tatutory construction is not an exercise to be undertaken without considerations of practicality, precept and experience[,]" as ignoring such consideration may result in a forced and narrow interpretation that does not comport with legislative intent). Based upon such considerations, the rule requiring express legislative delegation is tempered by the recognition that an administrative agency is invested with the implied authority necessary to effectuation of its express mandates.... See generally 2 Am.Jur.2d Administrative Law § 62 (1994) (explaining that "[t]he reason for implied powers is that, as a practical matter, the legislature cannot foresee all the problems incidental to carrying out

---

Act and its regulations, we did not discover any specific provisions governing placement activities, but, the regulations do incorporate the BOCA National Building Code and the CABO One and Two Family Dwelling Code, which might include standards for foundation construction and utility connections. See 12 Pa.Code §§ 145.41, 145.42.

the duties and responsibilities of the agency").

*Id.* at 495–96, 788 A.2d at 359–60 (citations and footnote omitted). Moreover, the delegation of authority to an agency is construed liberally when the agency is concerned with protecting the public's health and welfare. *Id.* at 498, 788 A.2d at 361.

 The CCA specifically authorizes the Department to promulgate regulations adopting the BOCA National Building Code or its successor codes. Section 304, 35 P.S. § 7210.304. According to the Department, the International Residential Code is a successor to the BOCA Code. This assertion is not disputed by petitioners.[18] Certainly the Department's authority to adopt model codes to serve as the basis for the Code includes the implied authority to adopt an appendix to a model code that the Department deems to be relevant. Accordingly, we conclude that the Department acted within its authority in adopting Appendix E as part of the Code. We also conclude that Appendix E regulates activities that fall within the scope of "construction." Appendix E provides standards for foundation systems, which includes footings, piers and anchorage installations, and skirting and perimeter enclosures. These activities are necessary to installing the manufactured home at the home site and, therefore, are a part of the "construction" process. Similarly, placement activities such as site preparation and connection to utilities are a part of the construction process and subject to regulation under the CCA. Finally, we reject petitioners' contention that the CCA does not authorize the Department to require issuance of permits for placement activities because site preparation, foundation construction and utility connection do not constitute "construction." Again, we conclude that petitioners construe the term "construction" too narrowly; we conclude that these activities are part of the construction process and properly regulated by the Department pursuant to the authority conferred by the CCA. We agree with the Department that the exclusion for manufactured and industrialized housing from the permitting requirements applies only to the housing structure that is shipped from the factory. The post sale activities are still subject to regulation and permitting requirements when applicable. The fact that the Code may add additional permitting requirements to those that existed under local regulation does not invalidate the regulations.

Accordingly, as the Code properly tracks the CCA and the Department has acted within its authority in enacting the challenged regulations, we deny petitioners' application for summary relief and grant the Department's preliminary objection in the nature of a demurrer.

### *ORDER*

AND NOW, this 24th day of June, 2004, the PRELIMINARY OBJECTION in the nature of a demurrer of the Department of Labor and Industry in the above captioned matter is hereby SUSTAINED and the PETITION for Review is DISMISSED. Petitioners' application for SUMMARY RELIEF is DENIED.

18. The International Code Council, or ICC, was founded in 1994 by BOCA (Building Officials & Code Administrators International, Inc.) and two other model code groups. The ICC then developed a set of single codes, or International Codes, including the International Residential Code. Since the development of the International Codes, the BOCA National Building Code has been discontinued; the 1999 edition was the last publication. *See* http://www.iccsafe.org/news/about